

JUDGE GRIESA

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CHAILE STEINBERG, Derivatively on
Behalf of JPMORGAN CHASE & CO.,

               Plaintiff,

    v.

JAMES DIMON, ELLEN V. FUTTER,
JAMES S. CROWN, DAVID M. COTE,
JAMES A. BELL, CRANDALL C.
BOWLES, LABAN P. JACKSON, JR.,
WILLIAM H. GRAY, III, DAVID C.
NOVAK, STEPHEN B. BURKE, LEE R.
RAYMOND, WILLIAM C. WELDON,
DOUGLAS L. BRAUNSTEIN, MICHAEL
J. CAVANAGH, and INA R. DREW,

               Defendants,

    -and-

JPMORGAN CHASE & CO.,

          Nominal Defendant.

Case No.

**14 CV 688**

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT FOR BREACH OF
FIDUCIARY DUTY, WASTE OF
CORPORATE ASSETS, UNJUST
ENRICHMENT AND VIOLATIONS OF
SECTION 14(a) OF THE SECURITIES
EXCHANGE ACT

DEMAND FOR JURY TRIAL

RECEIVED
FEB 0 3 2014
U.S.D.C. S.D. N.Y.
CASHIERS

# TABLE OF CONTENTS

I.      NATURE AND SUMMARY OF THE ACTION ................................................................1

II.     JURISDICTION AND VENUE ......................................................................................6

III.    THE PARTIES...............................................................................................................6

        A.      Plaintiff ...............................................................................................................6

        B.      Nominal Defendant.............................................................................................7

        C.      Defendants ..........................................................................................................7

        D.      The Individual Defendants' Control, Access, and Authority ...............................13

        E.      Compensation of the Individual Defendants.........................................................14

IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS .........................................................15

        A.      Fiduciary Duties................................................................................................15

        B.      Breaches of Duties ............................................................................................17

V.      FACTUAL ALLEGATIONS .........................................................................................18

        A.      Rigging the Electricity Market..........................................................................19

        B.      The "Sons and Daughters" Program ..................................................................21

        C.      The Credit Card Monitoring and Debt Scandals.................................................22

        D.      Manipulating LIBOR-Related Benchmark Interest Rates ...................................24

        E.      Violations Regarding the Madoff Ponzi Scheme.................................................26

        F.      JPMorgan's Marketing and Sale of Toxic Residential Mortgage Backed
                Securities...........................................................................................................40

        G.      The Proxy Statements and Corresponding Supplementary Statements By
                Director Defendants Contain False and Misleading Statements in
                Violation of Section 14(A) and in Breach of the JPMorgan Defendants'
                Duties of Candor, Loyalty, and Good Faith.........................................................68

                1. Misstatements and Omissions in the 2011 Proxy. .............................................71

                2. Misstatements and Omissions in the 2012 Proxy. .............................................82

*3. Misstatements and Omissions in the 2013 Proxy.* ...........................................89

VI.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ......................................92

    A.   Demand Is Futile As To Defendant Dimon ........................................................95

    B.   Demand Is Futile As To Defendant Bell..............................................................96

    C.   Demand Is Futile As To Defendant Bowles ........................................................97

    D.   Demand Is Futile To Defendant Burke................................................................98

    E.   Demand Is Futile As To Defendant Crown ..........................................................99

    F.   Demand Is Futile To Defendant Jackson ..........................................................101

    G.   Demand Is Futile As To Defendant Raymond....................................................102

    H.   Demand Is Futile As To Defendant Weldon.......................................................103

    I.   JPMorgan's Current Board Of Directors Violated The Fiduciary Duties
They Owed To The Company And To Its Shareholders .....................................104

VII. CAUSES OF ACTION ...........................................................................................105

  FIRST CAUSE OF ACTION ..........................................................................................105

    Against the Individual Defendants for Breach of Fiduciary Duty......................105

  SECOND CAUSE OF ACTION ......................................................................................110

    Against the Individual Defendants for Waste of Corporate Assets ....................110

  THIRD CAUSE OF ACTION ..........................................................................................111

    Against the Individual Defendants for Unjust Enrichment.................................111

  FOURTH CAUSE OF ACTION ......................................................................................112

  Derivatively Against the Director Defendants for Violation of Section 14(a) of the
Exchange Act and Rule 14a-9............................................................................112

Jury Demand ...................................................................................................................116

Plaintiff, by her attorneys, submits this Verified Shareholder Derivative Complaint against the Defendants named herein.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by plaintiff on behalf of nominal defendant JPMorgan Chase & Co. ("JPMorgan" or the "Company" or the "Bank") against certain of the Company's officers and directors for breach of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934. These violations of law have caused and will continue to cause substantial monetary losses to JPMorgan and other damages, such as to the Company's reputation and goodwill.

2.      Operating under the control and direction of JPMorgan's Chief Executive Officer, Defendant Dimon and the Board of Directors and other defendants, JPMorgan has been linked to many of the world's most devastating instances of financial fraud, manipulation, and wrongdoing. Many of these acts have jeopardized the financial stability and future of the national, if not global, economy. Overall, since 2009, JPMorgan has paid nearly $32 billion in penalties to federal and state law enforcement and financial regulatory agencies for a host of violations.

3.      JPMorgan's officers and directors have been obligated to ensure that JPMorgan's operations are conducted in a lawful manner such that JPMorgan is not subjected to billions of dollars in criminal and civil penalties, fines and settlements. However, they knowingly approved and/or recklessly permitted JPMorgan to operate with little effective oversight and supervision, thereby putting the company at substantial risk.

4.      Members of the JPMorgan Board of Directors have allowed JPMorgan to embark on this unprecedented course of recklessness and unlawful conduct in order to increase their own

personal fortunes.  During this time period, in which JPMorgan engaged in substantial fraudulent and illegal misconduct, compensation packages for JPMorgan executives soared and JPMorgan directors became wealthy based on the price of their JPMorgan stock, which was inflated in value due in significant part to JPMorgan's illegal and wrongful conduct. Defendant Dimon, the CEO of JPMorgan and the Chairman of JPMorgan's Board of Directors, has continued to be one of the highest paid executives in the United States.  From 2005 through 2012, Defendant Dimon earned in excess of $130 million. These financial benefits were all paid out of a company that was driven to increase profits with little regard for the legality and propriety of its conduct, or the harm that such conduct would inflict on JPMorgan itself, its shareholders and the American people.

5.     Criminal and civil prosecutions that have been brought by U.S. and European prosecutors against JPMorgan over recent years demonstrate a pattern of bad faith or dereliction of duty by JPMorgan's officers and directors, who failed to implement rules, regulations or internal controls necessary to ensure that the company operated in a lawful manner:

- **Electricity Market Rigging**: On November 14, 2012, the Federal Energy Regulatory Commission ("FERC") suspended the electric market-based rate authority of JPMorgan Ventures Energy Corporation ("JPMVEC"), a wholly owned and controlled JPMorgan subsidiary, for submitting false information to the Commission. In July of 2013, the Federal Energy Regulatory Commission ("FERC") issued a "Staff Notice of Alleged Violations" wherein the FERC found that JPMorgan violated the Commission's Prohibition of Electric Energy Market Manipulation, 18 C.F.R. § lc.2 (2012), by engaging in eight manipulative bidding strategies. The Staff Notice reported that a JPMorgan trading unit had gamed wholesale electricity markets for years, focusing on the time period from September 2010 to November 2012. According to a July 2013 announcement, JPMorgan agreed to pay **$410 million** to settle accusations that it manipulated

electricity prices. The amount consisted of a $285 million civil penalty and the return of $125 million in allegedly improper profits.

- **The "Sons and Daughters" Program**: In August 2013, reports surfaced that the U.S. Securities and Exchange Commission ("SEC") is coordinating a civil investigation with federal prosecutors and the FBI about a JPMorgan hiring program, created in 2006, that allegedly offered to exchange employment in JPMorgan positions overseas for business. According to reports, JPMorgan offered over 250 high-ranking positions to sons and daughters of high level Asian business partners and government officials in order to obtain lucrative business deals. The investigation is based on the Foreign Corrupt Practices Act of 1977, which essentially bans United States companies from giving "anything of value" to a foreign official to win "an improper advantage" in retaining business.

- **Credit Card Scandals**: On September 20, 2013, the Consumer Financial Protection Bureau ("CFPB") announced that JPMorgan agreed to pay **refunds totaling $309 million** to more than 2.1 million credit card customers.  In addition, the U.S. Office of the Comptroller of Currency assessed a **$60 million civil penalty** against JPMorgan. The joint investigation by the CFPB and the Office of the Comptroller resulted in a September 19, 2013 Consent Order that "found that [JPMorgan] engaged in unfair billing practices for certain credit card 'add-on products' by charging consumers for credit monitoring services that they did not receive."  In addition, the OCC is investigating JPMorgan for allegations that the Bank was using error-filled documents in lawsuits against debtors.

- **Manipulating LIBOR-Related Benchmark Interest Rates**: On December 5, 2013, it was disclosed that J.P. Morgan, along with five other financial institutions, was fined a staggering **$2.32 billion (€1.71 billion)** by European Union regulators for colluding to manipulate London interbank offered rate ("LIBOR")-related benchmark interest rates.

- **Subprime Residential Mortgage-Backed Securities ("RMBS")**: On November 15, 2013, JPMorgan agreed to a **$4.5 billion** settlement with 21 major institutional investors, ending mortgage repurchase and servicing claims.  Days later, on

November 19, 2013, JPMorgan agreed to pay **$13 billion** to settle a host of federal government and state lawsuits alleging that the Company and its subsidiaries made false statements about the quality of mortgage-backed securities it sold prior to the financial crisis. The $13 billion settlement is the largest penalty levied against a single financial institution for mortgage lending and securitization practices that contributed to the buildup of the housing bubble and the financial crisis that resulted when it burst. As part of the settlement, JPMorgan acknowledged that it "regularly represented to RMBS investors that the mortgage loans in various securities complied with underwriting guidelines" despite knowing those representations were false. "Without a doubt, the conduct uncovered in this investigation helped sow the seeds of the mortgage meltdown," Attorney General Eric Holder said in a statement.  Importantly, the deal does not remove the threat of criminal liability for housing-bubble era practices for JPMorgan executives or the bank itself.

- **<u>Violations Regarding the Madoff Ponzi Scheme</u>**: JPMorgan agreed to pay over **$2.6 billion** and admitted that it failed to warn law enforcement officials about Bernard L. Madoff's ("Madoff's") $65 billion Ponzi scheme in a series of settlements with the U.S. government and the trustee liquidating Madoff's investment firm. According to the U.S. Attorney for the Southern District of New York Preet Bharara's office and the New York office of the FBI, JPMorgan admitted to conduct that constitutes violations of the Bank Secrecy Act, including "failure to maintain an effective anti-money laundering program" and "failure to file a suspicious activity report," and agreed to reform its anti-money laundering policies in a deferred prosecution agreement. "JPMorgan, as an institution, failed and failed miserably. In part because of that failure, for decades, Bernie Madoff was able to launder billions of dollars in Ponzi proceeds," Bharara said.

6.    The Individual Defendants' failures in connection with (i) the implementation of proper rules, regulation, or internal controls to prevent manipulative bidding strategies in the electricity markets and the manipulation of LIBOR-related benchmark interest rates; (ii) the implementation of effective policies, procedures to prevent violations of the Bank Secrecy Act

and of the Foreign Corrupt Practices Act; (iii) effective oversight and supervision; and (iv) effective due diligence and quality control processes which allowed high risk investments containing subprime, high risk mortgage loans that had a high probability of default to be represented as low risk investments; constitute violations of their fiduciary duties and demonstrate a pattern of bad faith or dereliction of duty by JPMorgan's officers and directors, causing JPMorgan to violate federal and state law and thereby subjecting the Company to pay billions of dollars to settle and defend claims.

7.      Moreover, the election and reelection of the Director Defendants and other proxy proposals were approved by JPMorgan's shareholders based on  false and misleading proxy statements (the "Proxy Statements") issued by the Board of Directors of JPMorgan, in violation of Section 14(a) of the Securities Exchange Act of 1934 and in breach of the duties of candor, loyalty, and good faith owed to the shareholders. These Director Defendants, acting recklessly, in bad faith, and in conscious or reckless disregard of their duties, caused JPMorgan to issue Proxy Statements that were materially false and misleading in regards to the true financial condition of the Company and the true nature of the strength and efficacy of the Company's internal controls, particularly in regards to risk.

8.      Defendants' faithless stewardship of JPMorgan has caused substantial harm to the Company and its shareholders as JPMorgan faces substantial criminal and civil liability. This derivative action is  brought in order to recover those losses, force the Individual Defendants to disgorge the amounts by which they have been unjustly enriched, and strengthen the internal controls at JPMorgan in order to prevent the reoccurrence of further and future losses to the Company.

## II.     JURISDICTION AND VENUE

9.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because of claims presenting federal questions arising under the Exchange Act, and pursuant to 28 U.S.C. § 1367(a) because all other claims are so related to claims presenting federal questions that they form part of the same case or controversy.

10.     This Court has jurisdiction over each defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District under 28 U.S.C. § 1391 because (a) JPMorgan maintains its principal place of business in this District; (b) a substantial portion of the transactions and wrongs complained of herein – including the Individual Defendants' primary participation in the wrongful acts – occurred in this District; and (c) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.  Nominal Defendant JPMorgan is incorporated in Delaware with its principal place of business in New York City.

## III.     THE PARTIES

### A.  Plaintiff

12.     Plaintiff Chaile Steinberg is a current shareholder of JPMorgan and has been a shareholder of JPMorgan continuously from 2004 to the present.  Plaintiff is a citizen of Pennsylvania.

**B.  Nominal Defendant**

13.    Nominal Defendant JPMorgan Chase & Co. is a financial holding company incorporated under Delaware law with its principal place of business located at 270 Park Avenue, New York, New York. JPMorgan is a citizen of Delaware and New York.

**C.  Defendants**

14.    Defendant James Dimon ("Dimon") is the CEO, President, and Chairman of the Board of Directors (the "Board") of JPMorgan.  Dimon has been a director of JPMorgan since 2004;  Board Chairman since December 31, 2006; and JPMorgan's CEO and President since December 31, 2005. Dimon has been President and Chief Operating Officer since JPMorgan's merger with Bank One Corporation in July 2004.  Dimon is on the Board's Executive Committee and also on the Stock Committee for JPMorgan. The authority of the latter includes the declaration of dividends, authorization of the issuance of stock within Board-approved limitations, administration of the dividend reinvestment plan and implementation of share repurchase plans in accordance with Board-approved capital plans.  Dimon is named as a defendant in a securities class action complaint[1] that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  JPMorgan paid Dimon the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|------------------------|-------|
| 2012 | $1,500,000 |  | $12,000,000 | $5,000,000 | $170,020 | $18,717,013 |
| 2011 | $1,416,667 | $4,500,000 | $12,000,000 | $5,000,000 | $143,277 | $23,105,415 |
| 2010 | $1,000,000 | $5,000,000 | $7,952,400 | $6,244,300 | $579,624 | $20,816,289 |
| 2009 | $1,000,000 |  |  |  | $265,708 | $1,322,094 |

---

[1] *In re JPMorgan Chase & Co. Securities Litigation*, Case No. 1:12-cv-3852-GBD (S.D.N.Y. May 14, 2012) (the "Securities Class Action").

Dimon is a citizen of New York.

15.     Defendant Ellen Futter ("Futter") was a director of JPMorgan from 2001 through July, 2013, and a director of J.P. Morgan & Co. Incorporated from 1997 to 2000. Futter served on JPMorgan's Risk Policy Committee in 2005 through 2008 and in 2012. Futter, who served as a director of JPMorgan during the relevant time period alleged  this Complaint, retired from the JPMorgan Board of Directors in July 2013, along with David Cote, who served alongside her on the Risk Policy Committee in 2008. JPMorgan paid Futter the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2012 | $75,000 | $170,000 | $245,000 |
| 2011 | $75,000 | $170,000 | $245,000 |
| 2010 | $75,000 | $170,000 | $245,000 |

Futter is a citizen of New York.

16.     Defendant James Schine Crown ("Crown") is a current director of JPMorgan and has been one since 2004.  Crown is Chairman of the Risk Policy Committee and a member of the Board-level Executive Committee.  He also had been a director of JPMorgan Chase Bank, N.A., a wholly-owned subsidiary of JPMorgan, since 2010.   JPMorgan paid Crown the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2012 | $132,500 | $170,000 | $302,500 |
| 2011 | $130,000 | $170,000 | $300,000 |
| 2010 | $90,000 | $170,000 | $260,000 |

Crown is a citizen of Illinois.

17.     Defendant David M. Cote ("Cote") is a JPMorgan director and has been since 2007.  Cote is also a member of JPMorgan's Risk Policy Committee and has been since at least March 2009.  JPMorgan paid Cote the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2012 | $75,000 | $170,000 | $245,000 |
| 2011 | $75,000 | $170,000 | $245,000 |
| 2010 | $75,000 | $170,000 | $245,000 |

Cote is a citizen of New Jersey.

18.     Defendant James A. Bell ("Bell") is currently a director of JPMorgan and has been one since November 2011.  Bell is a member of the JPMorgan Audit Committee.

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2012 | $85,000 | $170,000 | $255,000 |

Bell is a citizen of Illinois.

19.     Defendant Crandall C. Bowles ("Bowles") is a director of JPMorgan and has been a director since 2006. Bowles is a member of the Audit Committee, Chairman of the Public Responsibility Committee and a member of the Board Executive Committee. JPMorgan paid Bowles the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2012 | $100,000 | $170,000 | $270,000 |
| 2011 | $88,750 | $170,000 | $258,750 |
| 2010 | $88,500 | $170,000 | $255,000 |

Bowles is a citizen of North Carolina.

20.     Defendant Laban P. Jackson, Jr. ("Jackson") is currently a director of JPMorgan and has been a director since 2004. Jackson is Chairman of the Audit Committee and a member

of the Board Executive Committee. Jackson has been a director of J.P. Morgan Securities Plc and of JPMorgan Chase Bank, N.A., wholly-owned subsidiaries of JPMorgan since 2010. JPMorgan paid Jackson the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $255,000 | $170,000 | $425,000 |
| 2011 | $252,500 | $170,000 | $422,500 |
| 2010 | $210,000 | $170,000 | $380,000 |

Jackson is a citizen of Florida.

21.     Defendant William H. Gray, III ("Gray") was a JPMorgan director from 2001 to May 2012.  Gray was also a member of JPMorgan's Audit Committee from at least 2009 to May 2012.  JPMorgan paid Gray the following compensation as an executive:

| Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $35,417 | $170,000 | $205,417 |
| 2011 | $96,250 | $170,000 | $266,250 |
| 2010 | $100,000 | $170,000 | $270,000 |

Gray is a citizen of Florida.

22.     Defendant David C. Novak ("Novak") was a director of JPMorgan from 2001 through 2011. JPMorgan paid Novak the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $35,000 | $170,000 | $205,000 |
| 2011 | $90,000 | $170,000 | $260,000 |
| 2010 | $90,000 | $170,000 | $260,000 |

Novak is a citizen of Kentucky.

23.     Defendant Stephen B. Burke ("Burke") is a current director of JPMorgan has been a director of JPMorgan since 2004. Burke is a member of the Compensation & Management Development Committee and the Corporate Governance & Nominating Committee. JPMorgan paid Burke the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2012 | $75,000 | $170,000 | $245,000 |
| 2011 | $75,000 | $170,000 | $245,000 |
| 2010 | $75,000 | $170,000 | $245,000 |

Burke is a citizen of Pennsylvania.

24.     Defendant Lee R. Raymond ("Raymond") is a current director of JPMorgan and has been one since 2001. He served as a director of J.P. Morgan & Co. Incorporated from 1987 to 2000. Raymond is Chairman of the Compensation & Management Development Committee, member of the Corporate Governance & Nominating Committee and member of the Board-level Executive Committee. JPMorgan paid Raymond the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2012 | $90,000 | $170,000 | $260,000 |
| 2011 | $90,000 | $170,000 | $260,000 |
| 2010 | $90,000 | $170,000 | $260,000 |

Raymond is a citizen of Texas.

25.     Defendant William C. Weldon ("Weldon") is a current director of JPMorgan and has been a director of JPMorgan since 2005. Weldon is a member of the Compensation & Management Development Committee, Chairman of the Corporate Governance & Nominating Committee and member of the Board-level Executive Committee. JPMorgan paid Weldon the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2012 | $86,250 | $170,000 | $256,250 |
| 2011 | $75,000 | $170,000 | $245,000 |
| 2010 | $75,000 | $170,000 | $245,000 |

Weldon is a citizen of Pennsylvania.

26.     Defendant Douglas L. Braunstein ("Braunstein") is JPMorgan's Vice Chairman and has been since January 2013. Braunstein was also JPMorgan's CFO from June 2010 to December 2012, Head of Investment Banking for the Americas from 2008 to June 2010, and served in a number of other senior Investment Banking roles, including as Head of Global Mergers and Acquisitions. Braunstein is named as a defendant in the Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  JPMorgan paid Braunstein the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Total |
|------|--------|-------|--------------|---------------|-------|
| 2012 | $750,000 | $2,125,000 | $4,350,000 | $1,500,000 | $10,537,984 |
| 2011 | $720,833 | $2,900,000 | $5,760,000 | $2,016,900 | $13,037,825 |
| 2010 | $383,333 | $3,840,000 | $10,080,000 | $934,100 | $16,668,705 |

Braunstein is a citizen of New York.

27.     Defendant Michael J. Cavanagh ("Cavanagh") is JPMorgan's Co-CEO of the Corporate and Investment Bank and has been since July 2012. Cavanagh was also JPMorgan's CEO of Treasury and Securities Services from June 2010 to July 2012 and CFO from 2004 to June 2010.  JPMorgan paid Cavanagh the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Total |
|------|--------|-------|--------------|---------------|-------|
| 2011 | $500,000 | $3,400,000 | $3,274,500 | $1,836,600 | $9,045,760 |
| 2010 | $500,000 | $2,032,000 | $2,000,000 | $1,553,200 | $6,127,480 |

Cavanagh is a citizen of New York.

28.    Defendant Ina R. Drew was JPMorgan's Chief Investment Officer from 2005 to May 2012.   Prior to becoming JPMorgan's Chief Investment Officer, Drew also served in various other positions at JPMorgan, including as Head of Global Treasury. JPMorgan paid Drew the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Total |
|------|--------|-------|--------------|---------------|-------|
| 2011 | $729,167 | $4,700,000 | $7,500,000 | $2,016,900 | $15,509,866 |
| 2010 | $500,000 | $5,000,000 | $8,937,000 | $1,108,000 | $15,943,231 |

Drew is a citizen of New Jersey.

29.    The Defendants identified in ¶¶ 14 and 26-28 are referred to herein as the "Officer Defendants." The Defendants identified in ¶¶ 14-25 are referred to herein as the "Director Defendants." Collectively, the Defendants identified in ¶¶14-28 are referred to herein as the "Individual Defendants."

**D.  The Individual Defendants' Control, Access, and Authority**

30.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by JPMorgan.

31.    Because of their advisory, executive, managerial, and directorial positions with JPMorgan, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of JPMorgan, including information regarding the Company's marketing and sale of RMBS and the Company's materially deficient internal controls.

32.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

**E.  Compensation of the Individual Defendants**

33.     As indicated above, the Individual Defendants received substantial compensation from JPMorgan during the relevant time period. The activities alleged herein, and the revenues derived therefrom, allowed Defendants to justify huge executive compensation packages. As such, all of the Defendants had a personal interest not to implement or enforce adequate internal controls at JPMorgan which would have prevented the wrongdoing alleged herein.  Defendants' misconduct allowed JPMorgan to increase its profits, but, in doing so, JPMorgan was exposed to substantial financial and regulatory risk and exposure.

34.     Defendant Dimon's highest compensation since becoming President and CEO of JPMorgan was in 2007, at the height of JPMorgan's wrongdoing. From 2005 through 2012, Defendant Dimon made approximately $134 million, $67 million of which he made from 2005 through 2007.

35.     The Director Defendants also benefitted from the company's illegal conduct, and received generous compensation packages for their tenure on the Board and approval of Dimon's activities. At all relevant times, the Directors received both cash and stock-based compensation, and as a matter of Board policy, the most significant portion of director compensation was linked to the Firm's common stock price. The Board's total compensation included approximately one-third cash and two-thirds stock-based compensation, including annual stock grants. According to JPMorgan's 2013 Proxy Statement, for the period between 2003 and 2012, each non-management director received an annual cash retainer of $75,000 and an annual grant of stock

units valued at $170,000 on the date of the grant. In addition, each member of the Audit Committee received an additional $10,000 cash retainer, and each chair of a Board committee received an additional retainer of $15,000 per year.

36.     Defendant Dimon was and is the sole member of the Board's "Stock Committee." As a Committee of one, Dimon has the authority to declare dividends, authorize the issuance of stock within Board-approved limits, administer the dividend reinvestment plan and implement share repurchase plans.

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.  Fiduciary Duties

37.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe JPMorgan and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage JPMorgan in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of JPMorgan and not in furtherance of their personal interest or benefit.

38.     Each director and officer of the Company owes to JPMorgan and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

39.     To discharge their duties, the officers and directors of JPMorgan were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of JPMorgan were required to, among other things:

(a)      ensure that the Company was operated in a diligent, honest and legal manner in compliance with all applicable federal, state and international laws, rules and regulations and that the Company complied with its legal obligations and requirements;

(b)      implement and provide effective oversight and supervision of proper rules, regulation, or internal controls to prevent manipulative bidding strategies in the electricity markets and the manipulation of LIBOR-related benchmark interest rates;

(c)      implement and provide oversight and supervision of effective policies, procedures to prevent violations of the Bank Secrecy Act and of the Foreign Corrupt Practices Act;

(d)      ensure effective due diligence and quality control processes;

(e)      properly and accurately guide investors and analysts as to the true financial condition of the Company, including making accurate statements about the Company's business prospects, and financial results and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(f)      conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(g)      remain informed as to how JPMorgan conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**B.  Breaches of Duties**

40.     The conduct of the Individual Defendants complained of herein involves a knowing and/or reckless, culpable violation of their obligations as officers and directors of JPMorgan, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

41.     The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised all of JPMorgan's Board at all relevant times.

42.     The Individual Defendants breached their duty of loyalty, good faith, and candor by their failures in: the implementation of proper rules, regulation, or internal controls to prevent manipulative bidding strategies in the electricity markets and the manipulation of LIBOR-related benchmark interest rates; the implementation of effective policies and procedures to prevent violations of the Bank Secrecy Act and of the Foreign Corrupt Practices Act; the solicitation of proxies from the Plaintiff and other JPMorgan shareholders by means of proxy statements which contained false and misleading statements and which omitted to state material facts that were necessary to make the statements contained therein not false and misleading; effective oversight and supervision; and effective due diligence and quality control processes which allowed high risk investments containing subprime, high risk mortgage loans that had a high probability of default to be represented as low risk investments, as detailed herein.  These improper practices wasted the Company's assets, and caused JPMorgan to incur substantial damage.

43.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of JPMorgan, were able to and did, directly or indirectly, exercise

control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, JPMorgan has expended, and will continue to expend, significant sums of money.

## V.        FACTUAL ALLEGATIONS

44.        JPMorgan is a financial holding company incorporated under Delaware law in 1968, with its principal place of business in New York, New York.  JPMorgan operates four lines of business, including the Corporate and Investment Bank, Asset Management, Commercial Banking, and Consumer and Community Banking.  JPMORGAN CHASE BANK, N.A. (the "JPM Banking Subsidiary") was at all relevant times the principal banking subsidiary of JPMorgan.  JPMORGAN CHASE BANK, N.A. provides banking services throughout the United States, and is subject to oversight and regulation by the United States Department of the Treasury, Office of the Comptroller of the Currency (the "OCC").

45.        Operating under the control and direction of JPMorgan's Chief Executive Officer, Defendant Dimon, and under the eyes of its Board of Directors, JPMorgan has been linked to many of the world's most devastating instances of financial fraud, manipulation, and wrongdoing. Many of these acts have jeopardized the financial stability and future of the national, if not global, economy.  JPMorgan's officers and directors have been obligated to ensure that JPMorgan's operations are conducted in a lawful manner such that JPMorgan is not subjected to billions of dollars in criminal and civil penalties, fines and settlements. However, they knowingly approved and/or recklessly permitted JPMorgan to operate with little effective oversight and supervision, thereby putting the company at substantial risk.

46.     Members of the JPMorgan Board of Directors have allowed JPMorgan to embark on an unprecedented course of recklessness and unlawful conduct in order to increase their own personal fortunes.  During this time period in which JPMorgan engaged in substantial fraudulent and illegal misconduct, compensation packages for JPMorgan executives soared and JPMorgan directors became wealthy based on the price of their JPMorgan stocks, which were inflated in value due in significant part by JPMorgan's illegal and wrongful conduct. Defendant Dimon, the CEO of JPMorgan and the Chairman of JPMorgan's Board of Directors, has continued to be one of the highest paid executives in the United States.  From 2005 through 2012, Defendant Dimon earned in excess of $130 million. These financial benefits were all paid out of a company that was driven to increase profits with little regard for the legality and propriety of its conduct, or the harm that such conduct would inflict on JPMorgan itself, its shareholders and the American people.

47.     Criminal and civil prosecutions that have been brought by U.S. and European prosecutors against JPMorgan over recent years demonstrate a pattern of bad faith or dereliction of duty by JPMorgan's officers and directors, who failed to implement rules, regulations or internal controls necessary to ensure that the company operated in a lawful manner.

**A.  Rigging the Electricity Market**

48.     On November 14, 2012, the Federal Energy Regulatory Commission ("FERC") suspended the electric market-based rate authority of JPMorgan Ventures Energy Corporation ("JPMVEC"), a wholly owned and controlled JPMorgan subsidiary, for submitting false information to the Commission. According to the FERC news release:

> "[JPMorgan] made factual misrepresentations and omitted material information over the course of several months of communications with the California Independent System Operator (California ISO) and in filings to the Commission

in connection with requests for information involving bidding activities in the California market."

49.    In July of 2013, the Federal Energy Regulatory Commission ("FERC") issued a "Staff Notice of Alleged Violations" wherein the FERC found that JPMorgan violated the Commission's Prohibition of Electric Energy Market Manipulation, 18 C.F.R. § lc.2 (2012), by engaging in eight manipulative bidding strategies. The Staff Notice reported that a JPMorgan trading unit had gamed wholesale electricity markets for years, focusing on the time period from September 2010 to November 2012. According to the FERC, JPMorgan's conduct led to overpayment of "tens of millions of dollars at rates far above market prices" in California alone. The manipulation of the electricity markets was said to include California and other states in the Midwest.

50.    A confidential government document sent to JPMorgan in March of 2013 from the FERC warned the bank that government investigators had determined that JPMorgan devised "manipulative schemes" that transformed "money-losing power plants into powerful profit centers," and that one of its most senior executives gave "false and misleading statements" under oath. The rigging of the electricity market by JPMorgan demonstrates that the Board of Directors, including the Defendants in this case, fostered an environment in which JPMorgan put profits over the implementation of internal controls and systems designed to prevent JPMorgan from engaging in illegal conduct.

51.    According to a July 2013 announcement, JPMorgan agreed to pay $410 million to settle accusations that it manipulated electricity prices. The amount consisted of a $285 million civil penalty and the return of $125 million in allegedly improper profits. The Defendants' conduct may have resulted in short-term profits for JPMorgan but has led to long-term financial harm to the company.

**B. The "Sons and Daughters" Program**

52.     In August 2013, reports surfaced that the SEC is coordinating a civil investigation with federal prosecutors and the FBI about a JPMorgan hiring program, created in 2006, that allegedly offered to exchange employment in JPMorgan positions overseas for business. According to reports, JPMorgan offered over 250 high-ranking positions to sons and daughters of high level Asian business partners and government officials in order to obtain lucrative business deals. The investigation is based on the Foreign Corrupt Practices Act of 1977, which essentially bans United States companies from giving "anything of value" to a foreign official to win "an improper advantage" in retaining business.  The bribery inquiry also carries the threat of criminal penalties.

53.     Recently, federal authorities have obtained confidential documents that shed more light on JPMorgan Chase's decision to hire the children of China's ruling elite, securing emails that show how the bank linked one prominent hire to "existing and potential business opportunities" from a Chinese government-run company.

54.     The documents, which also include spreadsheets that list the bank's "track record" for converting hires into business deals, offer the most detailed account yet of JPMorgan's "Sons and Daughters" hiring program, which has been at the center of a federal bribery investigation for months.  The spreadsheets and emails — recently submitted by JPMorgan to authorities and reviewed by the *New York Times* — illuminate how the bank created the program to prevent questionable hiring practices but ultimately viewed it as a gateway to doing business with state-owned companies in China, which commonly issue stock with the help of Wall Street banks.

55.     In their "historical deal conversion" spreadsheets, JPMorgan listed job candidates in one column and, in another column, the bank recorded its "track record" for winning business

from companies tied to those candidates. Other spreadsheets listed well-connected hires and the revenue JPMorgan earned from deals with private and state-owned Chinese companies linked to those hires, documents show.

56.     The spreadsheets included about 30 employees with ties to state-owned companies or Communist Party officials, including the daughter of the deputy minister of propaganda, a relative of a Chinese financial regulator and the nephew of the executive chairman at Sinotruk, which is part of a state-owned trucking enterprise.

57.     The hiring practices seemed to have been an open secret at the Bank's headquarters in Hong Kong. In the email citing the "existing and potential business opportunities," a senior JPMorgan executive in Hong Kong emphasized that the father of a job candidate was the chairman of the China Everbright Group, a state-controlled financial conglomerate. The executive also extolled the broader benefits of the hiring program, telling colleagues in another email: "You all know I have always been a big believer of the Sons and Daughters program — it almost has a linear relationship" with winning assignments to advise Chinese companies.

### C.  The Credit Card Monitoring and Debt Scandals

58.     On September 20, 2013, it was announced that JPMorgan was assessed $389 million in penalties and restitution to settle regulators' claims that it unfairly charged customers for credit-monitoring products.

59.     The Consumer Financial Protection Bureau ("CFPB") announced that JPMorgan agreed to pay refunds totaling $309 million to more than 2.1 million credit card customers.  The U.S. Office of the Comptroller of Currency ("OCC") found that the Bank's billing practices

violated Section 5 of the Federal Trade Commission (FTC) Act, 15 U.S.C. § 45(a)(1), which prohibits unfair and deceptive acts or practices.

60.     In addition, the OCC assessed a $60 million civil penalty against JPMorgan and the Bank will pay $20 million to the CFPB. The joint investigation by the CFPB and the Office of the Comptroller resulted in a September 19, 2013 Consent Order that "found that [JPMorgan] engaged in unfair billing practices for certain credit card 'add-on products' by charging consumers for credit monitoring services that they did not receive."

61.     The restitution ordered by the OCC will benefit consumers who, between October 2005 and June 2012, enrolled in and paid for identity theft protection products but did not receive the full benefit of the products. The restitution will include the full amount paid for these products, plus any associated over-limit fees, and finance charges.

62.     The OCC order also requires the bank to take a number of corrective measures that include ensuring compliance with the FTC Act, improving governance of third-party vendors associated with certain consumer products, developing an enterprise-wide risk management program for such consumer products marketed or sold by the bank or its vendors, and improving its consumer compliance internal audit program.

63.     The OCC has also expanded an ongoing probe that began in 2011 with allegations that JPMorgan was using error-filled documents in lawsuits against debtors. Banks such as JPMorgan have filed hundreds of thousands of lawsuits against delinquent credit card holders in the wake of the financial crisis.  As millions of Americans fell behind on payments, the charge-off rate for credit cards soared to $85 billion by the end of 2009, according to credit card comparison site Cardhub.com.

64.     Consumer attorneys began noting a number of collection cases built on shoddy records. Authorities in California, for instance, say JPMorgan flooded the courts with lawsuits against credit card holders based on flimsy evidence that they were in default.  On May 9, 2013, the California Attorney's General Office filed a complaint against JPMorgan for its unlawful credit card debt collection practices. According to the complaint, JPMorgan engaged in widespread "robo-signing" of faulty affidavits in credit card collection lawsuits, and created a "debt collection mill that abus[ed] the California judicial process" by "flood[ing] California's courts with collection lawsuits against defaulted credit card borrowers based on patently insufficient evidence." According to the California Attorney General, JPMorgan's practice of filing bogus lawsuits against consumers was simply a "bet that borrowers would lack the resources or legal sophistication to call [JPMorgan's] bluff."

### D.  Manipulating LIBOR-Related Benchmark Interest Rates

65.     Interest rate derivatives (e.g. forward rate agreements, swaps, futures, options) are financial products which are used by banks or companies for managing the risk of interest rate fluctuations. These products are traded worldwide and play a key role in the global economy. They derive their value from the level of a benchmark interest rate, such as LIBOR — which is used for various currencies including the Japanese yen — or the Euro Interbank Offered Rate ("Euribor"), for the Euro.  These benchmarks reflect an average of the quotes submitted daily by a number of banks who are members of a panel.  They are meant to reflect the cost of interbank lending in a given currency and serve as a basis for various financial derivatives. Investment banks compete with each other in the trading of these derivatives.  The levels of these benchmark rates may affect either the cash flows that a bank receives from a counterparty, or the cash flow it needs to pay to the counterparty under interest rate derivatives contracts.

66.     LIBOR is supposed to be a reliable reflection of the rate at which banks are lending to each other.  Based on the average of that rate, after highs and lows are discarded, the LIBOR index is used not just for financial derivative products, but as a key index for setting loan rates around the world, including adjustable rate mortgages, credit card payments and student loans here in the U.S.  LIBOR is also one of the leading interest rate benchmarks used to create payment terms on interest rate swaps with municipalities across America and around the globe.

67.     On December 5, 2013, it was disclosed that J.P. Morgan, along with five other financial institutions, was fined a staggering $2.32 billion (€1.71 billion) by European Union regulators for colluding to manipulate LIBOR-related benchmark interest rates.  This fine is the European Union's biggest penalty to date on any cartel. The fine was the result of an investigation begun over two years ago, on October 18, 2011, on EU cartels.

68.     Joaquín Almunia, the European Commission Vice President in charge of competition policy, said: "What is shocking about the Libor and Euribor scandals is not only the manipulation of benchmarks, which is being tackled by financial regulators worldwide, but also the collusion between banks who are supposed to be competing with each other. Today's decision sends a clear message that the Commission is determined to fight and sanction these cartels in the financial sector. Healthy competition and transparency are crucial for financial markets to work properly, at the service of the real economy rather than the interests of a few."

69.     Besides JPMorgan's role in colluding with other major financial institutions around the world to rig key rates, regulators are also pursuing JPMorgan in relation to other possible allegations. For instance, JPMorgan may have colluded in a separate cartel in a European version of Libor called Euribor.  JPMorgan has so far refused to admit to and settle charges that they participated in the rigging of Euribor.  According to the European Commission,

the Euribor investigation against JPMorgan will continue.  Additionally, JPMorgan has been

fined $109 million (€80 million) for its role in a Libor-like scandal related to the Japanese Yen.

70.     Gary Gensler, the outgoing Chairman of the Commodity Futures Trading

Commission ("CFTC"), previously testified to Congress that he began investigating allegations

that a global banking cartel was rigging Libor in the spring of 2008.

**E.  Violations Regarding the Madoff Ponzi Scheme**

71.     On January 6, 2014, JPMorgan consented to the filing of a two-count Information

(the "Information")[2] in the United States District Court for the Southern District of New York,

charging JPMorgan with failure to maintain an effective anti-money laundering program, in

violation of Title 31, United States Code, Sections 5318(h) and 5322(a) and Title 12, Code of

Federal Regulations, Section 21.21, and failure to file a suspicious activity report, in violation of

Title 31, United States Code, Sections 5318(g) and 5322(a) and Title 12, Code of Federal

Regulations, Section 21.11.  As part of the Deferred Prosecution Agreement (the "Agreement")[3],

JPMorgan admitted and stipulated that the facts set forth in the Statement of Facts, incorporated

by reference as part of the Agreement between the United States Attorney's Office for the

Southern District of New York ("USAO") and the JPM Bank Subsidiary, were true and accurate.

72.     As explained in the Information, the Currency and Foreign Transactions

Reporting Act of 1970 (commonly known as the Bank Secrecy Act, or "BSA"), 31 U.S.C. §

5311, et seq., and its implementing regulations require domestic banks and certain other financial

institutions to establish and maintain programs designed to detect and report suspicious activity,

---

[2] The Information is attached as Exhibit A.
[3] The Agreement, with the accompanying Statement of Facts, is attached as Exhibit B.

and to maintain certain related records "where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." 31 U.S.C. § 5311.

73.     Among other things, the BSA requires that financial institutions "maintain appropriate procedures to ensure compliance with [the BSA] and regulations prescribed under [the BSA] or to guard against money laundering." 31 U.S.C. § 5318(a)(2).  Pursuant to 31 U.S.C. § 5318(h)(l) and 12 C.F.R. § 21.21, JPMorgan through the JPM Banking Subsidiary was required to establish and maintain an anti-money laundering ("AML") compliance program that, at a minimum:

> a. provided internal policies, procedures, and controls designed to guard against money laundering;
>
> b. provided for a compliance officer to coordinate and monitor day-to-day compliance with the BSA and AML requirements;
>
> c. provided for an ongoing employee training program; and
>
> d. provided for independent testing for compliance conducted by bank personnel or an outside party.

74.     In addition, the BSA requires financial institutions to "report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1 ).  Pursuant to 31 U.S.C. § 5318(g) and 12 C.F.R. § 21.11, a financial institution is required to file a Suspicious Activity Report ("SAR'') when it "knows, suspects, or has reason to suspect" that a transaction, among other things, involves funds derived from illegal activities or has no apparent business or lawful purpose.  In the United States, SARs are filed with the Financial Crimes Enforcement Network ("FinCEN"), an agency of the United States Department of the Treasury.

75.     The Information to which JPMorgan consented states the following statutory allegations:

> COUNT ONE: In or about 2008, in the Southern District of New York and elsewhere, JPMORGAN CHASE BANK, N.A., the defendant, did willfully fail to establish an adequate anti-money laundering program, including, at a

minimum, (a) the development of internal policies, procedures, and controls designed to guard against money laundering; (b) the designation of a compliance officer to coordinate and monitor day-to-day compliance with the Bank Secrecy Act and anti-money laundering requirements; (c) the establishment of an ongoing employee training program; and (d) the implementation of independent testing for compliance conducted by bank personnel or an outside party, to wit, JPMORGAN CHASE BANK, N.A., failed to enact adequate policies, procedures, and controls to ensure that information about the Bank's clients obtained through activities in and concerning JPMC's other lines of business was shared with compliance and anti-money laundering personnel, and to ensure that information about the Bank's clients obtained outside the United States was shared with United States compliance and anti-money laundering personnel.

COUNT TWO: In or about October 2008, in the Southern District of New York and elsewhere, JPMORGAN CHASE BANK, N.A., the defendant, did willfully fail to report suspicious transactions relevant to a possible violation of law or regulations, as required by the Secretary of the Treasury, to wit, JPMORGAN CHASE BANK, N.A., the defendant, failed to file a Suspicious Activity Report in the United States with respect to transactions in bank accounts maintained by Madoff Securities.

76.     For more than three decades, the Madoff Securities investment advisory business was a massive, multi-billion dollar Ponzi scheme. From at least as early as the 1970s through Madoff's arrest on December 11, 2008, Madoff and his co-conspirators fraudulently promised investors in Madoff Securities that their money would be invested in stocks, options, and other securities of well-known corporations.  Contrary to these representations, investor money was in fact virtually never invested as promised. Instead, the Madoff Securities investment advisory business operated as a massive Ponzi scheme in which some investors were paid with money "invested" by different investors, and other proceeds were used to personally benefit Madoff and the people around him. At the time of its collapse in December 2008, Madoff Securities maintained more than 4,000 investment advisory client accounts, which purported to have a combined balance of approximately $65 billion. In fact, Madoff Securities had only approximately $300 million in assets at the time.

77.     From in or about October 1986 through Madoff's arrest on December 11, 2008, the Madoff Ponzi scheme was conducted almost exclusively through a demand deposit account and other linked cash and brokerage accounts held at the JPM Banking Subsidiary (collectively, the "703 Account").   During that time period, virtually all client investments were deposited into the primary Madoff Securities account at the JPM Banking Subsidiary and virtually all client "redemptions" were paid from a linked disbursement account, also held by Madoff Securities at the JPM Banking Subsidiary.

78.     Between approximately 1986 and Madoff's arrest in December 2008, the 703 Account received deposits and transfers of approximately $150 billion, almost exclusively from Madoff Securities investors. The 703 Account was not a securities settlement account and the funds deposited by Madoff's victims into the 703 Account were not used for the purchase and sale of stocks, corporate bonds, or options, as Madoff had promised his customers he would invest their money. Nor were the funds deposited into the 703 Account transferred to other broker-dealers for the purchase and sale of securities.

79.     The balance in the 703 Account generally increased over time, peaking at approximately $5.6 billion in August 2008. Between August 2008 and Madoff's arrest on December 11, 2008, billions were transferred from the 703 Account to customers of Madoff Securities, leaving a balance of only approximately $234 million.

80.     As described in the Statement of Facts, at various times between the late 1990s and 2008, employees of various divisions of JPMorgan and its predecessor entities raised questions about Madoff Securities, including questions about the validity of Madoff Securities' investment returns. At no time during this period did JPMorgan personnel communicate their concerns about Madoff Securities to AML personnel in the United States responsible for

JPMorgan's banking relationship with Madoff Securities. Nor did JPMorgan file any SAR in the United States relating to Madoff Securities until after Madoff's arrest.

81.     Since 2006, the Company's London-based Equity Exotics Desk, which specialized in creating complex derivatives based on the performance of certain investment funds, had issued structured products linked to the returns of "feeder" funds that were invested in Madoff Securities.  As a hedge for its issuance of these derivative products, JPMorgan made certain proprietary investments tied to the returns of Madoff Securities.  On October 16, 2008, an analyst on the Equity Exotics Desk, wrote a lengthy e-mail to the head of the desk and others about Madoff Securities (the "October 16 Memo"). The October 16 Memo, among other things, described JPMorgan's inability to validate Madoffs trading activity or even custody of assets; questioned Madoff's "odd choice" of a small, unknown accounting firm; and reported that JPMorgan "seem[ed] to be relying on Madoffs integrity" with little to verify that such reliance was well placed. The October 16 Memo ended with the observation that: "[t]here are various elements in the story that could make us nervous," including the "feeder" funds managers' "apparent fear of Madoff, where no one dares to ask any serious questions as long as the performance is good."

82.     The Head of Due Diligence responded by complimenting the Equity Exotics Analyst on the October 16 Memo, making reference to other long-running fraud schemes, and suggesting in a joking manner that they should visit the Madoff Securities accountant's office in New City, New York to make sure it was not a "car wash."

83.     The October 16 Memo was forwarded to JPMorgan's in-house and external counsel, as well as to JPMorgan's London-based Head of AML for the Europe, Middle East and Africa ("EMEA") region, who also served as JPMorgan's designated BSA Officer for the region

(the "EMEA BSA Officer"). Following review of the October 16 Memo and consultation with legal counsel, on or about October 29, 2008, the EMEA BSA Officer filed with the U.K. Serious Organised Crime Agency ("SOCA") an SAR, pursuant to the terms of the United Kingdom's Proceeds of Fraud Act (the "U.K. Report"). The U.K. Report was filed by the EMEA BSA Officer on behalf of JPMorgan Chase Bank, N.A. - the OCC-regulated entity- and identified Madoff Securities as its "main subject- suspect."

84.     Under "reason for suspicion," the EMEA BSA Officer wrote, in pertinent part:

> JPMCB's [i.e., JPMorgan Chase Bank, N.A.'s] concerns around Madoff Securities are based (1) on the investment performance achieved by its funds which is *so consistently and significantly ahead of its peers year-on-year, even in the prevailing market conditions, as to appear too good to be true - meaning that it probably is*; and (2) the *lack of transparency* around Madoff Securities trading techniques, the implementation of its investment strategy, and the identity of its OTC [over the counter] options counterparties; and (3) its *unwillingness to provide helpful information*. As a result, JPMCB has sent out redemption notices in respect of one fund, and is preparing similar notices for two more funds.

> [Emphasis added.]

85.     The U.K. Report continued that "JPMCB is also concerned about the conflict of interests which the three combined roles of BLM could represent"- i.e., acting "as sub-advisor, sub-custodian and broker/dealer to the funds in question"- a factor also cited in the October 16 Memo regarding JPMorgan's inability to verify that the assets of Madoff Securities "actually exist." The U.K. Report further noted that other investment advisors had attempted to replicate Madoffs stated strategy "but nowhere near as successfully as BLM," and that the feeder fund managers "appear to know very little about how BLM strategy and systems work, and seem unconcerned in view of its consistent profitability." Under the heading "[o]f further concern," the U.K. Report also described the "small and unknown" auditors used by Madoff Securities.

86.     The U.K. Report then quantified JPMorgan's Madoff-related hedge fund redemptions as being undertaken "as a result" of these suspicions: €150 million (out of a total of €200 million) from one fund, and $150 million (out of a total of $150 million) from another.

87.     On March 12, 2009, Madoff pleaded guilty to securities fraud, wire fraud, money laundering, and related offenses, and was subsequently sentenced to 150 years' imprisonment. These offenses, and others, were committed through transactions using Madoff's 703 Account at JPMorgan.

88.     After Madoff's arrest, JPMorgan AML personnel examined the 703 Account transactions and filed a series of SARs relating to suspicious transactions in that account. JPMorgan did not file any SAR in the United States relating to Madoff prior to his arrest.

89.     JPMorgan, through the JPM Banking Subsidiary, failed to file a SAR in the United States concerning Madoff Securities or Madoff. The concerns raised in the October 16 Memo were never communicated to anti-money laundering compliance personnel in the United States, and there was no meaningful effort by the Company to examine or investigate the Madoff Securities banking relationship with JPMorgan, including the transaction activity in the 703 Account.

90.     Prior to Madoff's arrest on December 11, 2008, JPMorgan, through the JPM Banking Subsidiary, lacked effective policies, procedures, or controls designed to reasonably ensure that information- such as the information culminating in the October 2008 report to SOCA- obtained in the course of JPMorgan's other lines of business, was communicated to anti-money laundering compliance personnel based in the United States. In addition, JPMorgan, through the JPM Banking Subsidiary, lacked effective policies, procedures, or controls designed to reasonably ensure that information about United States-based clients, obtained by JPMorgan

in its business abroad, was communicated to anti-money laundering compliance personnel based in the United States. These systemic deficiencies reflected a failure to maintain adequate policies, procedures, and controls to ensure compliance with the BSA and regulations prescribed thereunder and to guard against money laundering.

91.     Moreover, the Statement of Facts explains the following additional red flags and policy and procedure failures at JPMorgan regarding Madoff:

> Transactions In the Madoff Securities Account Identified By [JPMorgan] Private Bank Predecessors
>
> Beginning in the mid-1990s, employees in the Private Bank for Chemical Bank, a predecessor of [JPMorgan], identified a series of transactions between the account of a Private Bank client (the "Private Bank Client") and accounts held by Madoff Securities, including the 703 Account. As one of the bank's largest individual clients, with a portfolio valued (as of the mid-1990s) at approximately $2.3 billion, the Private Bank Client was highly valued by [JPMorgan] and its predecessors and was provided with his own office within [JPMorgan]'s offices. In addition, the Bank's Global Trust & Fiduciary Services business line served (along with Bernard L. Madoff) as co-executor and co-trustee of the Private Bank Client's will, and stood to earn approximately $15 million in fee income upon his death.
>
> The transactions between Madoff and the Private Bank Client consisted of "round-trip" transactions which would typically begin with Madoff writing checks from an account at another bank ("Madoff Bank 2") to one of the Private Bank Client's accounts at [JPMorgan] and its predecessors. Later the same day, Madoff would transfer money from his 703 Account to his account at Madoff Bank 2 to cover the earlier check from Madoff Bank 2 to the Private Bank Client at [JPMorgan]. And, in the final leg of the transaction, as known to [JPMorgan], the Private Bank Client would transfer funds from his [JPMorgan] account to the 703 Account in an amount sufficient to cover the original check he had received from Madoff at Madoff Bank 2. These round-trip transactions occurred on a virtually daily basis for a period of years, and were each in the amount of tens of millions of dollars. Because of the delay between when the transactions were credited and when they were cleared (referred to as the "float"), the effect of these transactions was to make Madoff's balances at [JPMorgan] appear larger than they otherwise were, resulting in inflated interest payments to Madoff by [JPMorgan].
>
> In or around November 1994, an employee of the [JPMorgan] Private Bank drafted a memo stating that "the daily cost associated with" the overdrafts from the transactions is "outrageous," and ***documenting calls on November 29, 1994, in which the employee informed both Madoff and the Private Bank***

*client that [JPMorgan] was aware of the activity and the fact that it allowed Madoff to earn interest on uncleared funds*. According to the memo, the Private Bank Client responded that "if Bernie is using the float, it is fine with me, he makes a lot of money for my account."

In or about 1996, personnel from Madoff Bank 2 investigated the round-trip transactions between Madoff and the Private Bank Client. As a result of that investigation, which included meeting with representatives of Madoff Securities, *Madoff Bank 2 concluded that there was no legitimate business purpose for these transactions, which appeared to be a "check kiting" scheme, and terminated its banking relationship with Madoff Securities*. According to personnel from Madoff Bank 2, *[JPMorgan] was notified of Madoff Bank 2's closure of Madoff's bank account*. In addition, although unknown to [JPMorgan] at the time, Madoff Bank 2 filed a SAR in or about 1996 identifying both Madoff Securities and the Private Bank Client as being involved in suspicious transactions at Madoff Bank 2 and [JPMorgan] "for which there was no apparent business purpose."

*[JPMorgan] Private Bank did not file a suspicious activity report relating to the transaction activity between the Private Bank Client and Madoff Securities, or terminate its banking relationship with Madoff, or direct the parties to cease such transactions*. [JPMorgan] allowed the Private Bank Client transactions to continue, although [JPMorgan] did require the Private Bank Client to reimburse [JPMorgan] for the interest payments that these transactions had cost the bank.

After Madoff Bank 2 closed the Madoff Securities account in or about 1996, the Private Bank Client and Madoff Securities continued to engage in round-trip transactions, the sizes of which increased, entirely through [JPMorgan] accounts. *In December 2001, the Private Bank Client engaged in approximately $6.8 billion worth of transactions with Madoff Securities- all between the Private Bank Client's accounts at [JPMorgan] and the Madoff Securities 703 Account- in a series of usually $90 million transactions*. These transactions continued through 2003.

*[JPMorgan] Private Bankers did not report the round-trip transactions between the Private Bank Client and Madoff Securities to [JPMorgan] AML personnel*. After Madoff's arrest in 2008, [JPMorgan] AML personnel reviewed the activity and filed a SAR concerning the above transactions.

\* \* \*

Questions About Madoff Securities's Investment Returns By A [JPMorgan] Investment Fund

Chase Alternative Asset Management ("CAAM")- the [JPMorgan] fund of funds open to institutional investors, and which was part of the Asset Management line of business also considered placing Madoff Securities on its platform in the late 1990s and again in or about 2007. In connection with reviewing Madoff's reported returns in the late 1990s, *one CAAM fund*

*manager commented on approximately December 10, 1998 that Madoff Securities returns were "possibly too good to be true," and that there were "too many red flags" to proceed with further due diligence."* In 2007, [JPMorgan]'s fund of funds again considered a Madoff investment, and also discontinued the due diligence early on because the first stages of the process provided "little additional insight as to the source of the [Madoff Securities] returns" and because [JPMorgan] learned that *Madoff would not meet with [JPMorgan] personnel to answer their questions*. *In neither the late 1990s nor 2007 did [JPMorgan] fund managers provide this information to [JPMorgan] AML personnel*.

[JPMorgan]'s Issuance Of Madoff Derivative Products

Beginning in approximately the Spring of 2006, [JPMorgan] invested approximately $343 million of the Bank's own money in Madoff "feeder funds"- funds that sent investor money to Madoff Securities- as a hedge for structured products issued by [JPMorgan]'s investment bank. Those derivative products were issued by [JPMorgan] in London in 2006 and 2007 through [JPMorgan]'s Equity Exotics Desk, a group that specialized in creating complex derivatives based on the performance of certain investment funds. The purpose of the products was to provide investors with "synthetic exposure" to hedge funds or other equities without the investor making a direct investment in the fund itself.

The Madoff-derivative products offered by [JPMorgan], which were issued in response to demand for Madoff Securities-related investments, generally worked as follows: [JPMorgan] issued notes (which it sold through various distributors) and promised to pay note-holders a return that corresponded to the return of a particular Madoff feeder fund. In order to hedge the risk created by those notes, [JPMorgan] then invested the Bank's own capital in the feeder fund directly. [JPMorgan]'s investment of its own money in the Madoff feeder funds as a hedge position would therefore in large part offset the risks associated with [JPMorgan]'s obligation under the notes. In this business model, [JPMorgan]'s Investment Bank profited from transaction fees associated with issuing the notes, and endeavored to minimize risk resulting from these issuances. Due to the features of the [JPMorgan]-issued notes, however, it was impossible for [JPMorgan] to eliminate all risks from its exposure to Madoff feeder funds. For example, with respect to certain notes issued by [JPMorgan] that would pay the noteholder three times the Madoff feeder fund's investment returns, [JPMorgan] would suffer no losses if the Madoff feeder fund decreased in value by less than 33%, but could suffer substantial losses if the Madoff feeder fund's value fell to zero.

[JPMorgan] required approval from the Investment Bank's Risk function in connection with its own investments in hedge funds, including the Madoff feeder funds. Under pre-existing guidelines in place in 2007, approval for investments in so-called single name hedge funds (like Madoff Securities) was set at $100 million in risk exposure to [JPMorgan] (meaning, the total amount [JPMorgan] could be expected to lose if [JPMorgan]'s investment lost virtually

all its value). Risk exposure above $100 million required approval from senior risk executives, with the level of approval depending on the size of the proposed investment. In assessing potential transactions that required individual approval from the [JPMorgan] risk function, risk officers assessed both "market risk" (i.e., the risk associated with the investment performance of the underlying fund, assuming the fund followed its advertised strategy) and "credit risk" (i.e., whether the fund could be trusted with the Bank's money). In the context of hedge fund investments, one credit risk factor in all proposed transactions was the risk that the fund manager was committing fraud. The scope of fraud risk ranged from a manager who deviated from a promised investment strategy to a manager who was reporting entirely fictitious returns.

From the outset, [JPMorgan]'s risk personnel recognized that there was little market risk provided that Madoff was investing client funds in the split-strike conversion strategy that Madoff claimed he was. Accordingly*, [JPMorgan] risk personnel promptly identified credit risk, and in particular the risk of fraud, as the central potential risk to [JPMorgan]. For example, in a February 1, 2006 e-mail, a risk executive evaluating the Madoff derivatives proposal commented, "[I]t seems to me the real systemic risk is that [Madoff] ends up being the next Refco and all their assets are frozen ...."*

<u>[JPMorgan]'s Head Of Risk Denies A Request To Increase The Bank's Risk Exposure to Madoff Securities By More Than $1 Billion And Caps [JPMorgan]'s Exposure At $250 Million</u>

There was significant investor demand for the [JPMorgan] notes tied to the performance of the Madoff feeder funds. By June 2007, [JPMorgan]'s position in Madoff feeder funds had created approximately $105 million in risk exposure to Madoff Securities.

In approximately June 2007, traders on the Equity Exotics Desk decided to ask for a combined risk limit exception for [JPMorgan]'s exposure to Madoff Securities through the various feeder funds in order to meet increasing demand for the structured products. Ultimately, senior investment bankers-including the Head of Equities for the Europe, Middle East and Africa region ("EMEA")-decided to seek approval to underwrite approximately $1 billion in Madoff-linked derivatives. Given the particular nature of the derivatives (some of which included features such as capital protection and offered the purchasers a degree of leverage), the $1 billion issuance would have resulted in a total of more than $1.32 billion of the Bank's proprietary capital to be invested directly into Madoff feeder funds as a hedge, resulting in total exposure for [JPMorgan] of approximately $1.14 billion if the value of the feeder funds fell to zero. It was estimated at the time that the proposed $1 billion issuance, if approved, would bring the Equity Exotics Desk approximately $55-70 million in revenue.

Because of the size of the proposed risk exception, the Investment Bank's Chief Risk Officer (the "CRO") required the proposal to be presented to the Investment Bank's Hedge Fund Underwriting Committee (the "Committee").

The Committee, chaired by the CRO, was comprised of executives from various of [JPMorgan]'s lines of business who were affected by transactions involving hedge funds. The decision whether to permit the requested risk exception rested ultimately with the CRO.

The Committee met to consider the Investment Bank's $1.14 billion Madoff Securities proposal on June 15, 2007, at 11:00 AM, at [JPMorgan]'s midtown-Manhattan offices. Investment Bank employees from the London Equity Exotics Desk participated by phone, and senior Equities executives- including the Investment Bank's Global Head of Equities- participated in person, as did other [JPMorgan] Executives from [JPMorgan]'s Investment Bank. Executives from the B/D Group also participated by phone to address any questions relating to [JPMorgan]'s banking or credit relationships with Madoff Securities.

*  *  *

Shortly after the Committee meeting ended, the CRO had lunch with another [JPMorgan] Executive (the "[JPMorgan] Executive"). During the lunch, the CRO sent an e-mail to, among others, the Investment Bank's Global Head of Equities, the Head of Equities for EMEA, and the head of the Equity Exotics Desk stating*: "[am sitting at lunch with [the [JPMorgan] Executive] who just told me that there is a well-known cloud over the head of Madoff and that his returns are speculated to be part of a ponzi scheme- he said if we google the guy we can see the articles for ourselves- Pls do that and let us know what you find."* In follow-up correspondence with the CRO, the [JPMorgan] Executive provided more specifics about the article and offered to find the article if the CRO had any difficulty locating it, explaining that he knew "nothing" on the subject other than what he read in what was "definitely an unflattering article."

In response to the CRO's e-mail about the Madoff Ponzi scheme rumors, the Global Head of Equities wrote that [JPMorgan] should "seriously look into it" as [JPMorgan] lent Madoff Securities money through the B/D Banking Group. The Global Head of Equities also commented that it was "hard to believe this would be going on over the years" because Madoff Securities was "regulated by SEC, NYSE, NASD etc." To this the CRO responded that "Refco was regulated by the same crowd [that regulates Madoff Securities] and there was noise about them for years before it was discovered to be rotten to the core," adding that "we owe it to ourselves to investigate further." And in another email several days later, the CRO wrote to one of the co-Chief Executive Officers of the Investment Bank that the [JPMorgan] Executive "told me Madoff has a very shady reputation in the market."

Neither the CRO nor anyone else at [JPMorgan] located the article to which the [JPMorgan] Executive had referred, although a junior [JPMorgan] employee conducted an unsuccessful search. The article referenced by the [JPMorgan] Executive was a 2001 *Barron*'s feature entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum."

The *Barron*'s article, among other things, raised some of the same issues identified by [JPMorgan]'s risk analysts. For example, it noted Madoff Securities had "produced compound average annual returns of 15% for more than a decade," and that "some of the larger, billion-dollar Madoff-run funds have never had a down year." The article then reported that "some on the Street have begun speculating that Madoff's market-making operation subsidizes and smooths his hedge-fund returns" and described how such smoothing could be accomplished through an unlawful practice known as front-running.

On or about June 27, 2007, the head of the Investment Bank's structured products group e-mailed the CRO a "quick reminder" that [JPMorgan] had "client trades requiring $150 mm of delta to buy in funds investing in Madoff on Friday of this week" and that there would be "further significant flows at next month end." The CRO then requested and received additional information from the B/D Group about Madoff Securities, including information from its credit reviews. On the same day, the CRO also spoke by telephone to Madoff, who answered questions asked by the CRO. At the same time, the CRO understood that Madoff would not authorize any further direct due diligence on Madoff Securities.

Later the same day, June 27, 2007, the CRO wrote "we will approve up to $250 mio for these trades," then clarified that he was approving $250 million of total risk exposure, to include both [JPMorgan]'s existing approximately $105 million in exposure as well as exposure generated through new transactions by the Investment Bank. Based on the decision to set risk exposure at $250 million, the Equity Exotics Desk ended its discussions related to other potential Madoff derivative transactions then under negotiation in order to stay within the risk limits.

June 2007- September 2008: The Equity Exotics Desk Monitors JPMC's Exposure to Madoff Securities

In approximately August 2007, an Equity Exotics employee ("Equity Exotics Banker I") conducted an analysis in order to determine the relationship between returns reported by a Madoff feeder fund and the investments in S&P 500 stocks and Treasury bills that Madoff claimed comprised his investment strategy. Equity Exotics Banker I was unable to determine based on available information how the Madoff feeder fund could have produced these returns had Madoff followed this strategy, writing that the market performance during the period analyzed was "far away" from the returns that Madoff "allegedly made." After obtaining further information and conducting further analysis, Equity Exotics Banker I e-mailed a colleague that he did "take comfort from the fact" that two separate Madoff feeder funds were reporting close to the same returns for the period.

 Also in the Fall of 2007, [JPMorgan] hired a "Head of Due Diligence" for the Equity Exotics Desk. On his first day on the job, the head of the Equity Exotics Desk directed the Head of Due Diligence to review the Madoff feeder fund

positions and offer any insight into how Madoff was able to generate his purported returns. ***The Head of Due Diligence was unable to explain the returns and learned that the Equity Exotics Desk was no longer interested in issuing products linked to the returns of Madoff Securities***.

On June 23, 2008, after reviewing e-mails about the failure of one of the feeder funds to provide information to [JPMorgan], including about how the money sent to Madoff was invested, and the departure of various feeder fund employees, a senior Equity Exotics banker e-mailed the head of the Equity Exotics Desk: "How much do we have in Madoff at the moment? To be honest, the more I think about it, the more concerned I am."

[Emphasis added.]

92.     It is apparent then that JPMorgan made no real appropriate effort to properly investigate the Madoff situation despite an obligation to monitor accounts for suspicious activity and on several occasions failed to press for information that might have exposed the Madoff fraud.

93.     Moreover, as indicated in the Statement of Facts, in the last months before the Ponzi scheme collapsed, JPMorgan cut back its exposure to Madoff's investment business, but took no further steps to comply with the BSA and regulations prescribed thereunder to guard against money laundering.

94.     In a series of settlements with the U.S. Government and the trustee liquidating Madoff's investment firm, JPMorgan has agreed to pay over $2.6 billion.  In the settlement with the U.S. Attorney for the Southern District of New York and the New York office of the FBI, JPMorgan will pay $1.7 billion which will go to Madoff's victims.  JPMorgan also agreed to pay $350 million to the Office of the Comptroller of the Currency and $461 million to the Financial Crimes Enforcement Network.  In addition, JPMorgan entered into a pair of settlements totaling approximately $543 million with Irving H. Picard, the trustee liquidating the Madoff estate on behalf of the Securities Investor Protection Corp.  The two settlements, filed in the Manhattan bankruptcy court, bring to a close litigation over avoidance claims Madoff Trustee Picard filed

against JPMorgan and a class action against the bank.  The avoidance claims settled for $325 million, $50 million of which will go to investors in Madoff's largest feeder fund, the Fairfield Sentry funds.

95.     "JPMorgan, as an institution, failed and failed miserably. In part because of that failure, for decades, Bernie Madoff was able to launder billions of dollars in Ponzi proceeds," US. Attorney Bharara said.

**F.  JPMorgan's Marketing and Sale of Toxic Residential Mortgage Backed Securities**

96.     RMBS are pools of mortgages deposited into trusts.  Shares of RMBS Trusts were sold as securities to investors such as Fannie Mae and Freddie Mac, for billions of dollars. These investments provided a stream of income from the payments on the mortgages underlying them. If these mortgages were of high quality, the RMBS Trusts would have been solid investments in the housing market and helped the housing market in the United States to prosper and grow. However, the mortgages which JPMorgan originated, pooled, securitized and sold were not high quality, but instead were subprime and of low quality, and the RMBS for which is was responsible were dangerous investments.

97.     On August 7, 2013, JPMorgan announced in its Form 10-Q filing with the U.S. Securities and Exchange Commission ("SEC") that it was under criminal investigation for its involvement in the subprime mortgage crisis. On November 15, 2013, JPMorgan announced a $4.5 billion settlement with 21 major institutional investors relating to RMBS trusts issued by JPMorgan. On November 19, 2013, JPMorgan and the U.S. Department of Justice separately announced a $13 billion settlement resolving claims against JPMorgan by the Justice Department, several State Attorneys General, the Federal Deposit Insurance Corporation, the National Credit Union Administration and the Federal Housing Finance Agency relating to

RMBS activities by JPMorgan.  The total agreement is the largest settlement ever between the government and a U.S. company.

98.     As part of the settlement, JPMorgan admitted to a Statement of Facts that outlined how it failed to disclose risks of buying RMBS from 2005 to 2008.  JPMorgan acknowledged that it told investors the mortgage loans it packaged as securities and sold complied with underwriting guidelines, while bank employees knew – and reported to bank "Managing Directors" in due diligence, trading and sales – that, in a number of instances, the loans in question did not.

99.     The Defendants knowingly authorized or recklessly allowed JPMorgan to commit multiple fraudulent and deceptive acts in promoting and selling subprime RMBS that the company created and packaged. In publicly filed documents and in marketing materials, JPMorgan led investors to believe that JPMorgan had carefully evaluated – and would continue to monitor – the quality of the loans in their RMBS. In reality, JPMorgan systematically failed to fully evaluate the loans, largely ignored the defects that its limited review did uncover, and concealed from investors both the inadequacy of the company's review procedures and the defects in the underlying mortgage loans. As a result, the loans contained within the RMBS created by JPMorgan included many that had been made to borrowers who were unable to repay and were highly likely to default. In fact, these borrowers did default in large numbers. At a minimum, the Defendants breached their fiduciary duties by abdicating their responsibilities to properly supervise and adequately oversee JPMorgan's subprime mortgage business. As alleged above, this misconduct exposed JPMorgan or its employees to potential criminal prosecution and has resulted in billions of dollars of settlements.

100.    JPMorgan's decision to push aggressively into the subprime RMBS market, in terms of originating subprime mortgage loans, securitizing subprime mortgage loans, and then marketing and selling those subprime RMBS, was made at a time when JPMorgan's financial operations were suffering. This aggressive change in JPMorgan's business and JPMorgan's extensive involvement in the subprime RMBS crisis could not have occurred without either the knowledge of the Defendants, or their bad faith disregard of their fiduciary obligations to JPMorgan.

101.    JPMorgan entered into the RMBS market beginning in or about 2000 and it continued to be heavily involved in the origination, securitization, marketing and sale of RMBS from 2000 through 2007.  During this time, JPMorgan actively and aggressively increased its role and position in the RMBS market by dramatically increasing the volume of mortgage loans they purchased and securitized. At the same time, JPMorgan was publically touting its leading underwriter and market-maker role in residential mortgages.

102.    Establishing a greater presence in the RMBS market was a deliberate choice made by JPMorgan in order to improve its financial performance. In 2005, JPMorgan was seriously underperforming the overall market. Pre-2005, JPMorgan's overall financial results were mediocre.  By October 2005, JPMorgan's share price was down significantly from past years and JPMorgan's stock was severely underperforming the S&P 500, the Dow Jones Industrial Average and the NASDAQ Composite averages. More importantly, JPMorgan had underperformed as compared to every other major financial institution, including Bear Stearns, WaMu, Morgan Stanley, and Goldman Sachs, all of which were arguably peers of JPMorgan. This lack of performance created intense pressure at JPMorgan to increase revenues and profits as quickly as possible. The senior officers and directors of JPMorgan, including the Defendants,

were desperate to improve JPMorgan's financial performance, and as a result, the internal controls and protocols put in place at JPMorgan for ensuring that JPMorgan acted in a legal and appropriate manner were pushed aside, ignored or minimized. This was done in order to boost profits.

103.    JPMorgan's CEO, Jaime Dimon, articulated JPMorgan's need to push profits in JPMorgan's 2005 Annual Report:

> "We are underperforming financially in many areas. We need to understand the reasons and focus our energy on making improvements, not excuses. We cannot afford to waste time justifying mediocrity. Each line of business now assesses its performance in a rigorous and very detailed way. Each compares results to targets in a variety of areas, including sales force productivity, customer service and systems development."

104.    Defendant Dimon emphasized that it was "imperative" for JPMorgan to begin "designing the right products that are also profitable" to improve performance. As a result, JPMorgan began to expand its high risk loan origination and securitization activities with a focus on "new product expansion initiatives." All of these were euphemisms for JPMorgan's newly aggressive move into the origination and securitization of subprime mortgages and the marketing and sale of subprime RMBS through fraudulent means.

105.    On September 15, 2010, William Collins Buell VI, formerly head of mortgage acquisition at J.P. Morgan Securities, testified before the FCIC that there was intense pressure at JPMorgan to compete with other firms involved in the mortgage-backed securities market. This pressure came from the highest levels of JPMorgan, with senior executives and JPMorgan's directors pushing the company to pump up profits, regardless of whether that involved entering a high risk business area. Despite that risk, the decision was made not to implement high levels of supervision and oversight, lest such supervision and oversight prevent JPMorgan from boosting its profits to the levels it could otherwise reach if allowed to operate in an unsupervised manner.

Buell testified that JPMorgan and other investment banks believed that there had "been a long period of stability, there [was] a great appetite for people who want to borrow money, and there's a great appetite for investors and others who want to employ their money. And so there was a competition among a large variety of participants in the market to try to expand the range of products that were available." "[T]here was a very competitive process to offer a wider and wider array of products to borrowers . . . there was a tremendous amount of competition to try to make products that people could actually get . . . and that investors and lenders would be interested in buying." Buell confirmed that this competition led to a reduction in diligence and oversight on the part of JPMorgan. Buell stated that from 2005 to 2007, JPMorgan's underwriting guidelines and origination standards were "deteriorating," a fact that was known at all levels throughout JPMorgan.

106.    However, in 2006, JPMorgan's performance was still trailing the performance of its major competitors, such as Bear Steams, Morgan Stanley, and Goldman Sachs. Desperate to reverse JPMorgan's underperformance, the Defendants decided to increase revenues and profits through increasing origination and securitization of residential mortgages. As stated by Defendant Dimon in JPMorgan's 2006 Annual Report, this was a key area for JPMorgan's growth in 2007:

> "Historically, our two businesses, Home Lending and the Investment Bank, barely worked together. In 2004, almost no Home Lending mortgages were sold through our Investment Bank. This past year, however, our Investment Bank sold 95% of the non-agency mortgages (approximately $25 billion worth) originated by Home Lending. As a result, Home Lending materially increased its product breadth and volume because it could distribute and price more competitively. This arrangement obviously helped our sales efforts, and the Investment Bank was able to build a better business with a clear, competitive advantage. In 2006, our Investment Bank moved up several places in the league-table rankings for mortgages. (Importantly, Home Lending maintained its high underwriting standards; more on this later.)"

107.    Because JPMorgan was expanding its loan origination and securitization practices and because this expansion was a major factor in increasing JPMorgan's revenues and profits, JPMorgan understood that investors would be particularly focused on the underwriting practices with respect to the mortgage loans that JPMorgan was securitizing into RMBS mortgage pools. Accordingly, JPMorgan's 2006 Annual Report reassured investors that JPMorgan had "materially tightened" its underwriting standards and would be "even more conservative" in originating mortgages. The 2006 Annual Report was signed by Defendant Dimon.

108.    Similarly, Defendants Dimon, Bowles, Burke, Crown, Futter, Jackson, Lipp, Novak, Raymond and Weldon all signed JPMorgan's filing on Form 10-K for the fiscal year ended 2006 which repeated the purportedly strong underwriting standards in place in JPMorgan in regards to mortgage loans. That filing concealed the fact that JPMorgan was not complying with its underwriting standards in the origination of mortgage loans and was becoming more aggressive in ignoring such standards in maximizing subprime loan volume. The filing also concealed that JPMorgan was maximizing subprime loan volume in order to maximize the number of high risk subprime RMBS that JPMorgan could later create and then sell through fraudulent means.

109.    JPMorgan generated mortgage loans in order to securitize those subprime mortgage loans through their own mortgage origination platform operated by Chase Home Finance LLC ("CHF"), the home mortgage division of JPMorgan Chase Bank, N.A. CHF originated far more of the mortgage loans that supported RMBS created by JPMorgan than any other mortgage loan originator. JPMorgan worked diligently to increase its own origination practices because it allowed JPMorgan "not only" to "secur[e] a permanent pipeline of product," but also "to control the quality of what [they were] creating."

110.   JPMorgan also purchased loans for securitization from financial institutions and other secondary mortgage-market sellers. Beginning in or around 2001, JPMorgan purchased mortgage loans for securitization through a bulk and a flow channel. "Bulk" acquisitions referred to purchases of loans in bulk from large third-party originators. "Flow" acquisitions referred to smaller-scale purchases of loans, typically on a loan-by-loan basis. JPMorgan often facilitated the origination and purchase of loans through both the bulk and flow channels by extending what was known as "warehouse" financing - essentially a line of credit - to originators with whom JPMorgan had a relationship. This was another mechanism by which JPMorgan inflated the volume of subprime mortgage loans to increase the number and dollar size of RMBS that JPMorgan could sell by misrepresenting the nature and risk characteristics of the RMBS and the subprime mortgage loans underlying the RMBS.

111.   JPMorgan's residential mortgage "securitization machine" involved numerous subsidiaries and/or sub-entities, including, but not limited to, the following:

### 1. JPMorgan Acquisition

112.   JPMorgan Acquisition has been involved in the securitization of a variety of different assets since its incorporation. For fiscal years  2004, 2005 and 2006, JPMorgan Acquisition securitized approximately  $4.5 billion, $24.1 billion, and $40.6 billion worth of residential mortgage loans, respectively.

113.   JPMorgan Acquisition was actively involved in all aspects of the mortgage loan securitization process. It determined the structure of the securitizations that were sold to investors, initiated the securitizations, purchased the mortgage loans to be securitized, determined distribution of principal and interest, and provided data to the credit rating agencies to secure investment grade ratings for the certificates. JPMorgan Acquisition also selected the

depositor that would be used to transfer its mortgage loans to the trusts, and selected the underwriter for the securitizations.

### 2. JPMorgan Acceptance

114.   JPMorgan Acceptance has similarly been engaged in the securitization of mortgage loans as a depositor since its incorporation. JPMorgan Acceptance was incorporated in 1998 as a special purpose entity formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificate holders, and depositing the underlying mortgage loans into the issuing trusts.

115.   In its capacity as the depositor, JPMorgan Acceptance purchased the mortgage loans from the sponsor pursuant to an Assignment Agreement or Assignment, Assumption and Recognition Agreement, as applicable. These agreements gave JPMorgan temporary ownership of the mortgage loans from the sponsor. Immediately thereafter, JPMorgan Acceptance then sold, transferred, or otherwise conveyed the mortgage loans to the trusts for securitization purposes. JPMorgan Acceptance, together with the other JPMorgan subsidiaries, was also responsible for preparing and filing the registration statements pursuant to which the RMBS certificates were offered for sale. The trusts held the mortgage loans for the benefit of the certificate holders, and issued the certificates in public offerings for sale to large institutional investors.

### 3. JPMorgan Securities

116.   JPMorgan Securities was the lead underwriter for JPMorgan's RMBS business. In its role as the lead underwriter, it was responsible for underwriting and managing the offer and sale of certificates to investors. In addition, as the lead underwriter, JPMorgan Securities was

also obligated to conduct meaningful due diligence to ensure that the registration statements did not contain any misstatements or omissions of material fact, including any misstatements or omissions regarding the manner in which the underlying mortgage loans were originated, transferred, and/or underwritten.

### 4. JPMorgan Chase and JPMorgan Bank

117.    JPMorgan Chase and JPMorgan Bank, through their wholly-owned subsidiaries, JPMorgan Acquisition (a direct subsidiary of JPMorgan Bank), JPMorgan Securities (a direct subsidiary of JPMorgan Chase), and JPMorgan Acceptance (a direct subsidiary of J.P. Morgan Securities Holdings LLC, which is, in turn, a direct subsidiary of JPMorgan Chase), played key roles in the securitization process. Unlike typical arms' length securitizations, the JPMorgan securitizations involved various JPMorgan subsidiaries and affiliates at virtually every step in the chain. JPMorgan Chase and JPMorgan Bank, either individually or through their subsidiaries, were involved in the origination of subprime mortgage loans, the securitization of subprime mortgage loans into subprime RMBS and then the marketing and sale of those subprime RMBS.

### 5. Chase Home Finance LLC

118.    Many of the residential home mortgage loans that served as the foundation for JPMorgan-sponsored securitizations were originated by Chase Home Finance LLC, the home mortgage division of JPMorgan. CHF originated far more of the mortgage loans underlying the JPMorgan securitizations than any other mortgage loan originator and allowed JPMorgan to pump up mortgage loan volumes when necessary to increase the number of mortgage loan securitizations that JPMorgan needed or wanted.

119.    By 2007, CHF was one of the top overall mortgage originators by volume in the United States with an 8.6% market share. CHF was also one of the top overall subprime mortgage originators by volume in the United States in 2007 with a 6.0% market share.

### 6. JPMorgan as Successor to WaMu Bank

120.    On September 25, 2008, JPMorgan Bank entered into a Purchase and Assumption Agreement (the "PAA") with the FDIC, under which JPMorgan agreed to assume substantially all of WaMu Bank's liabilities and purchase substantially all of WaMu Bank's assets, including WaMu Capital, WaMu Acceptance, and WaMu Securities. These WaMu entities served similar roles as the various JPMorgan sub-entities, in that various subsidiaries and sub-entities acted as depositor, trustee or sponsor of the RMBS securities.

121.    WaMu, like JPMorgan, had been involved in the securitization of a variety of assets since its incorporation. During the 2004, 2005 and 2006 fiscal years, WaMu Bank securitized approximately $34.7 billion, $71.6 billion, and $70.8 billion of residential mortgage loans, respectively.

### 7. JPMorgan as Successor to the Bear Stearns Companies, Inc.

122.    Pursuant to a March 16, 2008 Agreement and Plan of Merger (the "Merger") between JPMorgan and Bear Stearns, JPMorgan is the successor-in-interest to Bear Stearns. Bear Stearns, through its wholly-owned subsidiaries, sold billions of dollars of toxic RMBS to investors.

123.    Unlike typical arms' length securitizations, many of the Bear Stearns securitizations involved various Bear Stearns subsidiaries and affiliates at virtually each step in the process. Bear Stearns major affiliates and subsidiaries include:

- EMC Mortgage LLC (f/k/a EMC Mortgage Corporation). During the 2004, 2005 and 2006 fiscal years EMC securitized approximately

$48.4 billion, $74.5 billion, and $69.1 billion of residential mortgage loans, respectively.

- Structured Asset Mortgage Investments II Inc. ("SAMI") and Bear Stearns Asset Backed Securities LLC ("BSABS") were engaged in the securitization of mortgage loans as depositors since their incorporations in 2003 and 2004, respectively. They are special purpose entities formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificate holders, and depositing the underlying mortgage loans into the issuing trusts.

- Bear Stearns & Co. Inc. ("BSC") was the lead underwriter for RMBS. In that role, it was responsible for underwriting and managing the offer and sale of Certificates to investors. BSC was also obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including the manner in which the underlying mortgage loans were originated, transferred, and underwritten.

124.    At the same time that JPMorgan was selling out of its own subprime positions because it understood that these securities could "go up in smoke," JPMorgan was aggressively expanding the origination and securitization of high risk mortgages. JPMorgan was acting to protect its own interests by reducing its own exposure to the subprime markets but was content to continue to profit from the subprime market as long as it could shift the risk away from itself and onto investors. From 2006 to 2007, JPMorgan nearly doubled its securitizations of residential mortgage loans - from $16.8 billion in 2006 to $28.9 billion in 2007. To generate this enormous amount of securities, JPMorgan incentivized CHF, the mortgage loan origination arm of JPMorgan, to pump out subprime mortgage loans to high risk borrowers, loosened underwriting standards, and pressured appraisers to generate a large volume of subprime mortgage loans with inflated dollar figures. These poor-quality mortgages were then included into JPMorgan securitizations which were fraudulently marketed to investors as high quality investments.

125.    Many of the reports of JPMorgan's deficient underwriting practices come from JPMorgan's own employees and documents. For example, former regional vice-president, James

Theckston, was a recipient of the CHF "sales manager of the year" award. He explained to the *New York Times* that 60% of his 2006 performance review depended on him increasing the origination of high-risk loans.  A Banker Speaks, With Regret, *New York Times*, Nov. 30, 2011. In other words, it was built into the system of JPMorgan to pump out subprime mortgage loans regardless of the true creditworthiness of the borrower.

126.    Theckston also stated that CHF account executives could earn a commission for the origination of subprime loans that was seven times higher than for prime mortgages. As a direct result of JPMorgan's incentive program, CHF account executives intentionally looked for less savvy borrowers - those with less education, without previous mortgage experience, or without fluent English - and directed them toward subprime loans. According to Theckston, these borrowers were disproportionately minority borrowers who, as a result of CHF practices, ended up paying higher mortgage rates and were more likely to default and lose their homes. JPMorgan did not care about any of this, however, since the mere act of lending the money was profitable, since the subprime mortgage loans were packaged into subprime RMBS and then the risk sold off to others.

127.    In an undated JPMorgan internal memorandum, a JPMorgan employee working at generating new RMBS circulated tips for using "Cheats & Tricks" to allow JPMorgan mortgage loan originators to circumvent the in-house automated loan underwriting system to get risky loans approved. This memorandum states that the secret to getting risky loans approved is to inflate the borrower's income or to otherwise falsify their loan application. This was a well-known phenomenon within JPMorgan which had designed a system that was knowingly subject to frequent abuse.

128.    The JPMorgan memorandum also suggests that the automated loan-origination system, called "Zippy," could be adjusted. According to the "Zippy Cheats & Tricks" memorandum:

> "If you get a 'refer' or if you DO NOT get Stated Income / Stated Asset findings. . . . Never Fear!! ZiPPY can be adjusted (just ever so slightly). Try these steps next time you use Zippy! You just might get the findings you need!!:

> (1) In the income section of your 1003, make sure you input all income in base income. DO NOT break it down by overtime, commissions or bonus.

> (2) NO GIFT FUNDS! If your borrower is getting a gift [to cover some or all of the down  payment], add it to a bank account along with the rest of the assets. Be sure to remove any mention of gift funds on the rest of your 1003.

> (3) If you do not get Stated/Stated, try resubmitting with slightly higher income. Inch it up $500 to see if you can get the findings you want. Do the same for assets."

129.    These were step-by-step instructions on how to engage in fraudulent and potentially criminal conduct, all of which were contained within a JPMorgan internal memorandum. Mechanisms for bypassing JPMorgan's internal mortgage loan controls were well-known within JPMorgan during this time period and were routinely used and abused by JPMorgan during this time period. According to the memo, employees in JPMorgan's origination department should "never fear" if they "do not get stated income / stated asset findings" on the first attempt because they can try and try again until they get their desired result.  For example, by lumping contingent income with base income, concealing the receipt of gifts (which are typically required to be specifically disclosed in loan applications), and artificially inflating income, JPMorgan loan originators were able to approve countless loans that otherwise would not have satisfied Zippy's stated underwriting guidelines. All of these mechanisms created a false picture of the mortgage loan borrower's risk characteristic. The pervasive misuse of these mechanisms by JPMorgan infected not only the risk characteristic of individual mortgage loan

borrowers, but also the risk characteristic of the JPMorgan RMBS that were created using these subprime mortgage loans. This was misrepresented to investors.

130.    Government investigations into JPMorgan's unsound loan origination practices have confirmed the existence of a prevailing attitude within JPMorgan of using "cheats and tricks" to game the system and approve loans that are not in accordance with stated underwriting guidelines. These investigations also found that: (1) JPMorgan employees faced intense pressure to close loans at any cost; (2) JPMorgan employees manipulated loan data in order to close loans; (3) JPMorgan approved loans based upon inflated appraisal values; and (4) JPMorgan failed to adhere to sound underwriting guidelines. This failure of internal control and the lack of mechanisms to identify such problems demonstrate that the Defendants knowingly failed to meet their fiduciary obligations to JPMorgan.

131.    A loan processor and assistant to the branch manager at a Florida branch of CHF who was at CHF from April 2006 until August 2007, stated that CHF employees faced enormous pressure to close loans because their salaries were dependent solely upon quantity, not quality. For example, loan officers only received a salary their first two months at CHF. After the second month, their income was based upon commissions for the number of loans they closed. If they did not close loans, they did not receive a paycheck. No incentive existed for CHF employees to ensure that the mortgage loans at issue were of good quality. The statements of another JPMorgan employee were consistent with the statements of this CHF employee, stating that staff underwriters at JPMorgan received a salary plus bonus pay that was based on the quantity of funded loans.

132.    Other reports confirm that branch and regional managers within JPMorgan and CHF pressured loan officers across the United States to meet monthly quotas. This pervasive

pressure to pump up mortgage loan values and volume existed throughout JPMorgan. If a JPMorgan loan officer worked two months without closing a loan, he or she could be fired. According to sources within JPMorgan, "loan officers walked around on eggshells at month end" for fear of losing their job or not receiving the commission they needed to support themselves and their families. In other words, the issues at JPMorgan relating to subprime mortgage loans and subprime RMBS were systemic and not the result of bad acts by a few low-level JPMorgan employees.

133.   Underwriters at CHF also received monthly bonuses based upon the volume of loans closed, and management pressured CHF underwriters to close loans. Government investigations discovered that one regional manager would send the branch managers below him to CHF's underwriting office in New Jersey "to work the magic"[4] and close the loans.

134.   Due to this intense pressure from the highest levels of the JPMorgan hierarchy, many CHF employees inflated borrowers' income and modified loan files in order to push loans through. "It was very common to take stuff out of the loan file" in order to get a loan approved, said one unnamed CHF employee. For example, loan officers removed bank statements, paystubs, or other documents which showed the borrower's income so that the loans would not be hindered in closing.

135.   This created a systemic problem within JPMorgan in which JPMorgan employees at different stages in the securitization process knew that everything was falsified but continued to feed the "securitization machine." JPMorgan employees have stated that "loan officers knew

---

[4] CHF quotes are from confidential witnesses quoted in *Federal Home Loan Bank of Boston v. Ally Financial, Inc. et. al.*, No. 11-cv-1533 (Commw. of Mass. Super. Ct. Apr. 20, 2011).

[the borrowers] were making less income" than was stated on the loans because, acting on orders from the branch manager, the loan officers inflated the borrowers' income.

136.    CHF officers knew that incomes were routinely inflated because loan officers often brought their loans to the branch manager for help and instruction on how to make them close. In fact, one unnamed employee said that, "[t]he branch manager often fixed the loan . . . [he] figured out what LTV [the borrower] needed to close the loan and inflated the income to make the loan work." Branch managers also called the regional managers above them to help close problem loans.

137.    The statements of another CHF senior loan underwriter, further illustrates the systemic problems at JPMorgan and CHF, mainly that CHF closed loans based upon stated incomes that were false and inflated so that JPMorgan could securitize those subprime mortgage loans and profit off the sale of RMBS filled with these subprime, high-risk mortgage loans. This CHF senior loan underwriter recalled circumstances in which mortgage brokers changed applicants' stated incomes before they submitted the loan files to CHF. It was common, after the loans closed and weren't performing, that when CHF would contact the borrower, CHF would "hear the borrower say, 'I never said I make that much.'"

138.    In addition to approving loans based upon inflated incomes, CHF employees have admitted approving loans based upon inflated appraisal values. In fact, CHF employees were reportedly "not allowed to contest appraisals that appeared to be inflated." As a result of the housing bubble, appraisers over-adjusted and ensured that the appraisals came in at or above the sales price. For example, there are reports of one subdivision in California in which homes sold in the second phase of the subdivision build-out doubled the value of those sold in the first phase, which had occurred just a few months earlier. In this instance, according to a CHF employee,

"[t]he first phase appraisals were valued at $200,000. The second phase, based on speculative investors buying and selling, pushed the values to $400,000. You'd look at the comps and there would be two inside the 'division' and one outside, but you couldn't contest the value."

139.   A senior underwriter at JPMorgan Chase Bank, N.A., who worked for JPMorgan from April 2001 to June 2008, stated that managers at JPMorgan Chase Bank, N.A. often overturned the decisions of lower-level underwriters and approved stated-income loans that had been previously rejected. This was consistent with the overall policy at JPMorgan which was to push through subprime mortgage loans at any cost. The complete absence of any mechanism for supervising JPMorgan's origination and securitization of subprime mortgage loans, as well as the sale and marketing of subprime RMBS constitutes an abdication of the Defendants' responsibilities as JPMorgan officers and directors.

140.   JPMorgan's complete departure from sound underwriting standards has been confirmed by JPMorgan's own CEO and Board Chairman, Jaime Dimon. In testimony given before the FCIC on January 13, 2010, Defendant Dimon stated that "the underwriting standards of our mortgage business should have been higher." Defendant Dimon confessed that JPMorgan "misjudged the impact of more aggressive underwriting standards and should have acted sooner and more substantially to reduce the loan-to-value ratios."

141.   In his March 30, 2012 annual letter to shareholders, Defendant Dimon reaffirmed that JPMorgan, during the relevant time period, had materially loosened its underwriting standards and issued problematic loans to borrowers. Defendant Dimon acknowledged that "avoiding making bad loans - as we all learned again in this crisis - also is important" and that "traditional mortgage underwriting loosened over time." All Defendants, including Dimon, knew

or should have known that JPMorgan's underwriting standards were deteriorating but this was allowed to occur because JPMorgan's profitability was significantly boosted because of this.

142.    Defendant Dimon, however, was not prepared to tell the whole truth yet. In the March 30, 2012 letter to shareholders, Defendant Dimon deflected blame away from himself and the other Defendants and blamed the subprime mortgage crisis on "unscrupulous mortgage officers" who were "miss-selling mortgages" and on "some mortgage borrowers" who were "lying on mortgage documents." Defendant Dimon wrote in that letter that "[w]e [JPMorgan] were one of the better actors in this situation - but not good enough; we made too many mistakes. We generally were a better underwriter." Defendant Dimon went on to write that "[m]any of our problems were inherited from Bear Stearns and WaMu." In this manner, Defendant Dimon sought to deflect the blame on a few "rogue" mortgage officers and "bad" mortgage borrowers, concealing the massive systematic problems at JPMorgan that led the company to the massive settlements recently announced. These systematic problems are not the result of the actions of a few low-level JPMorgan employees, or the work of just those inherited businesses, but rather the systemic breach of fiduciary duties owed by the Defendants, as senior officers and directors of JPMorgan.

143.    Relying on poor underwriting, JPMorgan originated hundreds of millions if not billions of dollars' worth of mortgage loans that were destined to fail. Theckston, a former JPMorgan regional vice-president, stated to the *New York Times*, "[i]f you had some old bag lady walking down the street and she had a decent credit score, she got a loan." The *New York Times* noted that, when asked for a response to Theckston's account, JPMorgan "didn't deny the accounts of manic mortgage-writing . . . and noted that Chase no longer writes subprime or 'no document' mortgages."

144.     Far from following prudent and cautious underwriting guidelines and making occasional, targeted and justified exceptions when other evidence of ability to repay justified a deviation from the guidelines, variance from the stated standards was the norm at JPMorgan, and many loans were made with essentially little to no effort to evaluate ability to repay. The reality of JPMorgan's mortgage lending process was in significant variance from what JPMorgan was representing to the public and to its shareholders and investors.

145.     Alongside JPMorgan's defective underwriting practices, JPMorgan also had enormous financial incentives to complete as many securities offerings as quickly as possible without regard to ensuring the accuracy or completeness of the registration statements, or conducting adequate and reasonable due diligence of the underlying investments. The securitization of these high-risk subprime mortgage loans into RMBS not only provided JPMorgan with massive profits, it was also necessary to move the risks off of JPMorgan's books and dump them on someone else. Through these RMBS securitizations, JPMorgan's depositors received a percentage of the total dollar amount of the offerings upon completion of the securitizations, and JPMorgan Securities, as the lead underwriter, received a commission based on the amount that was received from the sale of the certificates to the public. Since none of the JPMorgan entities assumed the credit risk or default risk of the underlying mortgage loans, there was little, if any, incentive, for JPMorgan to conduct full, complete, and meaningful due diligence of the statements in the RMBS registration statements relating to the creditworthiness of the underlying mortgage loans.

146.     JPMorgan's drive to securitize large volumes of mortgage loans contributed to the absence of internal controls necessary to prevent JPMorgan from issuing registration statements and prospectuses that included untrue statements of material facts and omitting material facts, in

particular about JPMorgan's deteriorating underwriting standards and the use of fraudulent statements and marketing to sell subprime RMBS. This absence of internal controls has also subjected JPMorgan and/or its employees to potential criminal liability. During the 2005 to 2007 time period, JPMorgan utterly failed to conduct adequate due diligence of the underlying subprime mortgage loans and failed to ensure the accuracy of statements contained in the registration statements pertaining to the RMBS securitizations.

147.    During the relevant time period, JPMorgan retained third-parties, including Clayton Holdings, Inc. ("Clayton") and The Bohan Group, Inc. ("Bohan"), to analyze the loans they were considering placing in their securitizations. While this superficially created a layer of due diligence, in reality, JPMorgan waived a significant number of loans into the securitizations that these firms had recommended for exclusion. JPMorgan did so without taking adequate steps to ensure that these loans had in fact been underwritten in accordance with applicable guidelines or had compensating factors that excused the loans' non-compliance with those guidelines.

148.    On January 27, 2008, Clayton revealed to the public that it had entered into an agreement with the New York Attorney General (the "NYAG") to provide documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients. The New York Times reported on January 27, 2008 that Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

149.    The documents that were released by Clayton show that JPMorgan was aware - on a daily basis - of material weaknesses in the loan pools and in the underwriting standards of the mortgage loan originators they used to support their RMBS securitizations. According to an

internal Clayton "Trending Report," JPMorgan was told that a significant portion of the loans that Clayton reviewed for their respective sponsor entities "failed to meet guidelines." Moreover, these loans were not properly approved as "exception loans" because they did not have any "compensating factors." JPMorgan was also informed that 27% of the loans reviewed by Clayton for JPMorgan Acquisition were not underwritten according to represented underwriting standards. JPMorgan was therefore well aware that it was securitizing bad loans and it was well aware that its representations to investors that the RMBS were safe, low risk investments, were false.

150.    Confronted with such a high failure rate on these mortgage loans, Defendants, as the executive management and directors of JPMorgan, should have either rejected the mortgage pool outright, increased oversight of the company's internal underwriting, or investigated whether the third party mortgage loan originators involved could be considered a trusted source of loans in the future.

151.    Instead, JPMorgan chose to continue and maintain its own poor internal underwriting standards and policies, and to continue to work with problematic and potentially unscrupulous mortgage loan originators. All of these mortgage loan originators, based on the economic incentives created by JPMorgan, were driven to maximize the dollar value and volume of subprime mortgage loans to create subprime RMBS that could be sold to third-party investors. Moreover, JPMorgan failed to disclose the red flags revealed by Clayton's review to investors in the RMBS. According to Clayton's "Trending Report," JPMorgan "waived in" to its pools over 50% of the defective loans that Clayton had identified as being outside the guidelines.

152.    Clayton's "Trending Report" is compelling evidence that JPMorgan and the Directors knew the company was securitizing defective loans and selling the resulting high-risk

securities to investors. Beyond the high risk nature of the RMBS, however, was the misrepresentations made by JPMorgan to investors that these RMBS investments were safe and low risk. On September 23, 2010, Clayton's Vice President Vicki Beal testified that, through its numerous roles as underwriter and sponsor, JPMorgan was made fully aware on a regular basis that a significant percentage of its loans failed to meet stated underwriting guidelines, but were being included anyway in the mortgage pools underlying residential mortgage backed securities sold to investors.

153.    JPMorgan not only let poor loans pass into its securitizations in exchange for underwriting and securitization fees, it also took the fraud further, affirmatively seeking to profit from this knowledge of the low quality nature of the mortgage loans. Rather than rejecting these loans from the mortgage loan pool, as it should have, JPMorgan used the evidence of underwriting defects to negotiate lower prices for the loans from third-party mortgage originators, thus boosting their own profits. According to the September 2010 testimony of Clayton's former president, D. Keith Johnson, before the FCIC, the banks, such as JPMorgan, used the exception reports to demand a lower price for themselves, which provided no benefit to investors:

> "I don't think that we added any value to the investor, the end investor, to get down to our point. I think only our value was done in negotiating the purchase between the seller and securitizer. Perhaps the securitizer was able to negotiate a lower price, and could maximize the line. We added no value to the investor, to the rating agencies."

FCIC Staff Interview with D. Keith Johnson, Clayton Holdings, LLC (Sept. 2, 2010), available at http://fcic.law.stanford.edu/resource/interviews. Rather than exclude defective and high risk mortgage loans from the collateral pools, or cease doing business with consistently failing mortgage loan originators, the information provided by companies like Clayton was instead used to insist on a lower price from the mortgage loan originators.

154.    JPMorgan allowed into the RMBS securitizations a substantial number of defective and high risk mortgage loans that, as reported to them by Clayton and other third-party due diligence firms, did not conform to the underwriting standards that JPMorgan represented in registration statements, prospectuses and prospectus supplements.   Even after learning from these third-party due diligence firms that there were high percentages of defective or at least questionable loans in the sample of loans reviewed by the third-party due diligence firms, JPMorgan made no effort to take any additional steps to verify or evaluate the accuracy of these reports from these third-party due diligence firms.

155.    The FCIC later confirmed the accuracy and truth of the Clayton report, finding that during the period from the first quarter of 2006 to the second quarter of 2007, 27% of the mortgage loans that JPMorgan submitted to Clayton to review for inclusion in RMBS mortgage loan pools were rejected by Clayton as falling outside the applicable underwriting guidelines. Of the mortgage loans that Clayton found defective, 51% were subsequently "waived in" by JPMorgan without proper consideration and analysis of compensating factors and included in securitizations. *See* The Financial Crisis Inquiry Report, at 167, Jan. 2011, available at http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf.

156.    A report generated as part of the New York Attorney General's ongoing investigation of investment banking misconduct in underwriting mortgage-backed securities stated that Clayton routinely provided the banks with detailed reports of loans that were not compliant with underwriting guidelines, but that the banks, including JPMorgan, routinely ignored Clayton and other third-party due diligence firms and overrode the exclusion of a significant percentage of rejected loans from purchase and securitization.

157.    JPMorgan was one of the largest issuers of private mortgage-backed securities in 2007 with a 5.7% market share.   From 2000 to 2007, JPMorgan increased its volume of subprime RMBS issuances from a negligible amount in 2000 to $11.4 billion in 2007, with a total issuance of $22.8 billion from 2005-2007. For the 2005-2007 time period, JPMorgan was the eleventh largest issuer of subprime RMBS in the United States.

158.    On September 1, 2010, JPMorgan's Chief Risk Officer, Barry Zubrow, told the FCIC that "there was a tradeoff between certain financial covenants and protections versus a desire to maintain market share." In this case, JPMorgan, through its senior officers and directors, chose to maintain market share instead of protecting JPMorgan and ensuring that the company did not engage in illegal misconduct.

159.    In an April 15, 2008 report, the Federal Reserve of New York concluded that JPMorgan needed to "strengthen [its] exposure measurement and limit framework around leveraged lending." The Federal Reserve also reported that JPMorgan's "deterioration in the quality of the firm's consumer portfolios" resulted from "loosened underwriting standards" and "shortcomings in oversight and controls governing third party mortgage loan origination activities," as well as "breakdowns in the 'originate to distribute' model, namely weak underwriting standards and investor concentration risk in collateralized loans obligations."

160.    In his January 13, 2010 testimony before the FCIC, Defendant Dimon confirmed CHF's overreliance on third parties to originate loans, testifying that these broker-loans performed markedly worse: "We've also closed down most—almost all of the business originated by mortgage brokers where credit losses have generally been over two times worse than the business we originate ourselves." Dimon went on testify that "there were some unscrupulous mortgage salesmen and mortgage brokers. And, you know, some people missold."

These misrepresentations, however, concealed the fact that the subprime problem at JPMorgan was a systemic crisis created, facilitated or tolerated by the Defendants' failure to properly discharge their duties, and not simply by the result of bad acts of a few unscrupulous mortgage salesmen and mortgage brokers. With his testimony, Dimon sought to conceal and minimize the fact that JPMorgan's problems were systemic and reached the highest levels of the company, problems that would subject JPMorgan to criminal investigation and billions in settlements.

161.    When Dimon was asked whether JPMorgan conducted stress tests in order to prevent its exposure to these systemic risks and what risk management procedures were in place, he replied: "[i]n mortgage underwriting, somehow we just missed, you know, that home prices don't go up forever and that it's not sufficient to have stated income in home [loans]." Dimon was later quoted as saying,"[t]here was a large failure of common sense" because "[v]ery complex securities shouldn't have been rated as if they were easy-to-value bonds." This was not something that somehow JPMorgan missed. This failure occurred because the Defendants in this case failed to perform their fiduciary duties to the company.

162.    The evidence discussed above shows that JPMorgan was falsely marketing its RMBSs, including:

  • The pervasive misrepresentations relating to basic information about the underlying mortgage loans, such as owner occupancy and LTV ratios, and knowledge of inaccurate and misleading credit ratings;

  • Third-party due diligence providers such as Clayton and Bohan informed JPMorgan that significant percentages of loans in the pools did not adhere to underwriting guidelines. For example, Clayton admitted that in the period from the first quarter of 2006 to the second quarter of 2007, 27% of the mortgage loans JPMorgan submitted for review in RMBS loan pools were rejected by Clayton as falling outside the applicable underwriting guidelines;

  • Of the 27% of mortgage loans that Clayton found defective, 51% were subsequently   waived in by JPMorgan without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested. JPMorgan's waiver of over half of the defective loans shows that JPMorgan knew of or recklessly

disregarded the systemic failure in underwriting and the fraudulent misrepresentations in the offering materials received by the GSEs.

163.    The strikingly high number of JPMorgan's loans that were rejected by third-party due diligence firms, yet were then subsequently "waived" into securitizations by JPMorgan, shows JPMorgan's knowledge that defective loans were being included in their offerings. It further shows that JPMorgan knowingly and intentionally misrepresented the risk profile and quality of the RMBS that it was selling to investors, with the knowledge or reckless disregard of the Defendants.

164.    JPMorgan, directly and through its various affiliates and subsidiaries, participated in every step of the securitization process, from the origination and servicing of the mortgage loans, to the sponsoring and structuring of the securitization, to the underwriting and marketing of the certificates that represented an investment in the RMBS. This vertical integration at all levels of the process allowed JPMorgan to control and manipulate the loan level documentation and the value at which properties were appraised, and to ensure that loans would be approved by its loan underwriters. It also shows that JPMorgan was deeply involved with this process, such that it would be impossible for JPMorgan and the Defendants to claim that they were the unwitting victims of unscrupulous third-party actors.

165.    Similarly, in the purchase of mortgage loans from third-party originators, Defendants willfully ignored internal controls, red flags and warnings from third-party due diligence firms and pushed high risk mortgage loans into RMBS securitizations despite express warnings not to do so. JPMorgan could have examined the loan files as part of its due diligence process but instead used third-party due diligence firms like Clayton to examine only a small percentage of the loan files. In instances where the third party due diligence firms rated the loans as failing to meet the underwriting standards, JPMorgan often chose to include such defective

loans in the securitizations anyway, thereby passing the risk of delinquency and default to investors. The purported use of these third-party due diligence firms became another part of the fraud. The use of these third-party due diligence firms was meaningless since JPMorgan essentially ignored their work.

166.    JPMorgan's reckless behavior continued through the subprime mortgage crisis. When investors demanded that JPMorgan's newly acquired subsidiary, Bear Stearns, repurchase mortgage loans that were not underwritten to represented standards of quality, JPMorgan denied those repurchase requests while simultaneously making repurchase demands for the very same loans from the mortgage loan originator, Capital One Financial Corp.

167.    In a June 26, 2008 letter to Capital One, Allison Malkin, an executive director with JPMorgan Securities (the entity with which Bear Stearns was eventually merged), stated "that it is [Bear Stearns'] position that these breaches materially and adversely affect the value" of the mortgage loans. "JPMorgan Refused Mortgage Repurchases It Also Sought, Ambac Says," Bloomberg (Jan. 24, 2011).

168.    Under Defendants' watch, JPMorgan abandoned its underwriting standards and condoned fraud by encouraging its employees to ignore and manipulate JPMorgan's automated underwriting system, called "ZiPPY." "Chase mortgage memo pushes 'Cheats & Tricks,'" The Oregonian (March 27, 2008). CHF went so far as to explicitly instruct loan originators to falsify loan information in order to elicit approval from the ZiPPY automated underwriting system for stated income loans of poor quality.

169.    By 2006, however, JPMorgan had grown alarmed at the increasing rate of late payments in its own subprime portfolio. With full knowledge that the company's own subprime portfolio was at risk of losses, JPMorgan decided to exit its own subprime positions. This

decision came from JPMorgan's CEO and Board Chairman Jaime Dimon, with the knowledge and consent of the other Defendants, demonstrating knowledge of the perilous state of the JPMorgan's subprime assets by JPMorgan own senior management and Board of Directors.

170.    An article in Bloomberg on February 17, 2010 revealed that Dimon was fully aware that its RMBSs were of poor and deteriorating credit quality and that he directed JPMorgan to shed the associated risk from JPMorgan's own balance sheet. The article reported that "[i]n October 2006, Mr. Dimon, JPMorgan's CEO, told William A. King, its then head of securitized products, that [JPMorgan] needed to start selling its subprime-mortgage positions."

171.    In late 2008, Fortune Magazine reported on the same October 2006 phone conversation, where Dimon allegedly instructed Mr. King to sell JPMorgan's positions: "I really want you to watch out for subprime! . . . We need to sell a lot of our positions. I've seen it before. This stuff could go up in smoke!" By the end of 2006, JPMorgan had unloaded $12 billion in subprime assets that JPMorgan itself had originated. Despite Dimon's view that JPMorgan's subprime holdings "could go up in smoke!" and JPMorgan's decision to sell its own holdings in subprime assets, JPMorgan continued to originate and securitize low quality, high risk mortgage loans and vouch for their quality.

172.    JPMorgan's settlement with the Justice Department amounts to the largest fine ever assessed against an American bank. The deal includes $9 billion in cash relief, including $4 billion to settle claims by the Federal Housing Finance Agency ("FHFA"), acting as conservator of Fannie Mae and Freddie Mac, that JPMorgan misled Fannie Mae and Freddie Mac about the quality of loans it sold them in the run-up to the 2008 financial crisis. Notably, the $13 billion settlement would not resolve the related criminal investigation by the U.S. Attorney's Office.

173.    JPMorgan's pervasive wrongdoing in these scandals could not have escaped the notice of the Individual Defendants, who were the top officers and directors of JPMorgan, had they been appropriately discharging their fiduciary duties to the company.   In particular the RMBS business had a massive impact on JPMorgan's profitability, transforming JPMorgan at the relevant time from subpar financial performance into a hugely profitable institution. The senior officers and directors of JPMorgan either knowingly allowed JPMorgan to drive those profits through wrongful acts, or chose not to implement policies and procedures adequate and necessary to ensure such wrongful acts did not occur.

**G.  The Proxy Statements and Corresponding Supplementary Statements By Director Defendants Contained False and Misleading Statements in Violation of Section 14(A) and in Breach of the JPMorgan Defendants' Duties of Candor, Loyalty, and Good Faith.**

174.    The Proxy Statements (including the SEC filings and other documents incorporated by reference therein), as well as Proxy Supplements and other supplementary statements by the Director Defendants, contained material misstatements and omissions in violation of the federal securities laws and in violation of the Director Defendants' duty of candor and other fiduciary duties to shareholders, the effect of which was to harm the Company and to deprive each shareholder who voted of the right to cast an informed vote.

175.    At the time the Proxy Statements were filed, Defendants knew, or had access to readily available information that would have informed them, that the Proxy Statements contained material misstatements and omissions.

176.    A list of the relevant Proxy Statements, and the activity which should have informed the statements in those Proxy Statements, is as follows:

**Rigging the Electricity Market**
- <u>Penalty/Restitution</u>: $410 M – announced July 2013
- <u>Activity occurred</u>: Sept. 2010 through Nov. 2012

- <u>Proxy Statements released during that time</u>: April 7, 2011, April 4, 2012; Regarding the continuing nondisclosure of JPMorgan's liability exposure: April 10, 2013 Proxy Statement (had received Suspension Nov. 2012 & Warning March 2013).
- <u>Investigation/Notice/Agency</u>: Suspension Nov. 2012; Warning March 2013; Staff Notice from FERC July 2013. Notice to Defendants at a minimum from any investigatory inquiries from FERC which resulted in the Nov. 2012 suspension.

**The "Sons and Daughters" Program**

- <u>Penalty/Restitution</u>: not yet assessed
- <u>Activity occurred</u>: since start of program in 2006
- <u>Proxy Statements released during that time</u>: March 30, 2007, March 31, 2008, March 31, 2009, March 31, 2010, April 7, 2011, April 4, 2012, April 10, 2013
- <u>Investigation/Notice/Agency</u>: FBI Investigation start date unclear – reports of the investigation surfaced in August 2013. Notice to Defendants: The hiring practices seemed to have been an open secret at the Bank's headquarters in Hong Kong.

**The Credit Card Monitoring and Debt Scandals**

- <u>Penalty/Restitution</u>: $369 M – announced Sept. 20, 2013
- <u>Activity occurred</u>: Oct. 2005 through June 2012
- <u>Proxy Statements released during that time</u>: March 31, 2006, March 30, 2007, March 31, 2008, March 31, 2009, March 31, 2010, April 7, 2011, April 4, 2012; nondisclosure of continuing liability exposure: April 10, 2013
- <u>Investigation/Notice/Agency</u>: Investigation began in 2011. CFPB & OCC. Notice to Defendants at a minimum from any investigatory inquiries from these agencies.

**Manipulating LIBOR-Related Benchmark Interest Rates**

- <u>Penalty/Restitution</u>: $2.32 B – announced Dec. 5, 2013
- <u>Activity occurred</u>: arguably from at least 2008 through Dec. 2013
- <u>Proxy Statements released during that time</u>: March 31, 2008, March 31, 2009, March 31, 2010, April 7, 2011, April 4, 2012, April 10, 2013
- <u>Investigation/Notice/Agency</u>: EU began investigation October 18, 2011; CFTC began investigation "Spring of 2008." Notice to Defendants at a minimum from any investigatory inquiries from these agencies.

**Violations Regarding the Madoff Ponzi Scheme**

- <u>Penalty/Restitution</u>: $2.6 B – announced Jan. 6, 2014
- <u>Activity occurred</u>: 1986 through 2008
- <u>Proxy Statements released during that time</u>: Regarding undisclosed JPMorgan Madoff risk: (including) March 31, 2006, March 30, 2007, March 31, 2008. Regarding the continuing nondisclosure of JPMorgan's role in the Madoff scheme and exposure to

liability: March 31, 2009, March 31, 2010, April 7, 2011, April 4, 2012, April 10, 2013

- Investigation/Notice/Agency: US Attorney's Office investigation start date unclear but Defendants were certainly aware of the Company's liability exposure when Madoff was arrested. Earlier notice examples: in 1996 JPMorgan was notified that Bank 2, which had been engaged in round trips, had closed the Madoff account because of a suspected scheme; in 2007 JPMorgan fund of funds refused to use Madoff investments because Madoff would not meet with [JPMorgan] personnel to answer their questions; also in 2007, there was a "well-known cloud over the head of Madoff and that his returns are speculated to be part of a ponzi scheme"; fall 2007: The Head of Due Diligence was unable to explain the returns and learned that the Equity Exotics Desk was no longer interested in issuing products linked to the returns of Madoff Securities.

**JPMorgan's Marketing and Sale of Toxic Residential Mortgage Backed Securities**

- Penalty/Restitution: $4.5 B to institutional investors, $13 B to DOJ – announced Nov. 15 & 19, 2013
- Activity occurred: failed to disclose risks of buying RMBS from 2005 to 2008
- Proxy Statements released during that time: Regarding undisclosed risk: March 31, 2006, March 30, 2007, March 31, 2008. Regarding the continuing nondisclosure of JPMorgan's liability exposure: March 31, 2009, March 31, 2010, April 7, 2011, April 4, 2012, April 10, 2013
- Investigation/Notice/Agency:   Notice examples: Clayton Holdings Treading Reports; Clayton told the New York Attorney General "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio";  William Collins Buell VI stated that from 2005 to 2007, JPMorgan's underwriting guidelines and origination standards were "deteriorating," a fact that was known at all levels throughout JPMorgan.  Agencies: DOJ, several State Attorneys General, the Federal Deposit Insurance Corporation, the National Credit Union Administration, and the Federal Housing Finance Agency. Company announced SEC investigation Aug. 2013.   Criminal investigation still ongoing.

177.    Defendants Dimon, Bowles, Burke, Cote, Crown, Futter, Jackson, Raymond, and Weldon issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to shareholders that were contained in the Company's Proxy Statements  issued on April 7, 2011 ("2011 Proxy"), April 4, 2012 ("2012 Proxy"), and April 10,

2013 ("2013 Proxy").   In addition Bell issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to shareholders that were contained in the Company's proxies issued on April 4, 2012 and April 10, 2013 and Defendants Gray and Novak issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to shareholders that were contained in the Company's proxies issued on April 7, 2011 and April 4, 2012.

### *1. Misstatements and Omissions in the 2011 Proxy.*

178.    The 2011 Proxy listed the following voting matters to be decided at the May 17, 2011 meeting:

> **Matters to be voted on**:
> • Election of directors
> • Ratification of appointment of PricewaterhouseCoopers LLP as our
>   independent registered public accounting firm for 2011
> • Advisory vote on executive compensation
> • Advisory vote on frequency of advisory vote on executive
>   compensation
> • Approval of Amendment to Long-Term Incentive Plan
> • Shareholder proposals, if they are introduced at the meeting
> • Any other matters that may properly be brought before the meeting

179.    Shareholder proposals in the 2011 Proxy were regarding political non-partisanship, shareholder action by written consent, mortgage loan servicing, political contributions, genocide-free investing, and independent lead director.

180.    In regards to the Board's role in risk oversight, the 2011 Proxy references the risk management section described in the Management Discussion and Analysis of the 2010 Annual Report starting at page 107 as well as stating the following in the actual Proxy Statement:

> <u>Risk appetite</u> – The Firm employs a ***formal risk appetite framework to clearly link*** risk appetite and return targets, controls and capital management.
>
> * * *

- 71 -

<u>Board oversight</u> – The Board of Directors exercises its oversight of risk management principally through the Board's Risk Policy Committee and Audit Committee.

• The Risk Policy Committee oversees senior management risk-related responsibilities, including ***reviewing management policies and performance against these policies and related benchmarks***.

• The Audit Committee reviews with management the system of internal controls that is relied upon to provide reasonable assurance of compliance with the Firm's operational risk management processes.

• In addition, the Compensation Committee is responsible for reviewing the Firm's compensation practices and the relationship among risk, risk management and compensation in light of the Firm's objectives.

• Each of the committees oversees reputation risk issues within their scope of responsibility.

• The Board of Directors also reviews selected risk topics directly as circumstances warrant

[Emphasis Added].

181.    Moreover the 2011 Proxy assured investors of the Company's Code of Conduct:

**Code of Conduct and Code of Ethics for Finance Professionals** – The JPMorgan Chase Code of Conduct is a collection of rules and policy statements governing employees' conduct in relation to the Firm's business. In addition, the Firm has a Code of Ethics for Finance Professionals that applies to the CEO, President, Chief Financial Officer (CFO), Chief Accounting Officer of the Firm, and to all other professionals of the Firm worldwide serving in a finance, accounting, corporate treasury, tax or investor relations role. The purpose of the Code of Ethics for Finance Professionals is to promote honest and ethical conduct and compliance with the law, particularly as related to the maintenance of the Firm's financial books and records and the preparation of its financial statements.

182.    Regarding compensation, the 2011 Proxy assured shareholders:

… Because our CEO, the Board and the Compensation Committee focus on long-term profitability based on sound business strategy, compensation decisions are not based on short-term formulaic results. Instead, our compensation structure is designed to reward sustained performance over multiple years by delivering a higher percentage of total compensation in equity, which vests over several years, and lesser amounts annually in cash.

Compensation decisions in 2010 for our senior leaders were driven by return on investments based on balanced risk measures and long-term value creation for the Firm, our clients and our shareholders. Each of our NEOs is a member of the Firm's Operating Committee. Our CEO along with the

Board and the Compensation Committee assessed all of the Operating Committee members against quantitative and qualitative priorities set early in 2010. The Board's determination of compensation for our CEO reflected his extraordinary contribution to the Firm and to the U.S. and global economy during 2010 and throughout the last several challenging years.

Our compensation philosophy, policies and practices drive accountability, are designed to link pay to performance, and balance rewards with sound business decisions and effective risk management. The recent crisis has focused attention on the incentive compensation practices in our industry and has prompted attention on balancing compensation structures that might encourage excessive risk-taking. And while many practices continue to be proposed, we continue to believe that our practices over the past several years have been prudent and effective, substantially consistent with the principles underlying regulatory concepts and very effective for JPMorgan Chase.

183.     The 2011 Proxy also cites "Robust risk management and compensation recovery policies deter excessive risk-taking and improper risk management" as a foundation of the Company's approach to compensation

184.     The 2011 Proxy also reported JPMorgan's 2010 financial results as follows:

**2010 Performance**

An overview of the performance for the Firm as a whole and for each line of business is at Appendix D at pages 59-63. Against the backdrop of some improvement in the business environment, JPMorgan Chase significantly improved its operating performance and continued to support the global economic recovery by providing capital, financing and liquidity to its clients in the U.S. and around the world. As described in the Firm's Management discussion and analysis (MD&A) in the Annual Report on Form 10-K, our financial results were strong relative to 2009. The highlights below illustrate some of the key metrics and results that we use in evaluating the Firm's performance for the purpose of making executive compensation decisions. During and for 2010:

• The Firm reported full-year 2010 net income of $17.4 billion, or $3.96 per share, on net revenue of $102.7 billion. Net income was up 48% compared with net income of $11.7 billion or $2.26 per share in 2009.

• Return on common equity was 10% for the year, compared with 6% in the prior year, and return on tangible common equity was 15% for the year, compared with 10% in 2009.

• The Firm continued to strengthen its fortress balance sheet during 2010, ending the year with a Tier 1 Common ratio of 9.8% and Tier 1 Capital

ratio of 12.1%. Total stockholders' equity at December 31, 2010, was $176.1 billion.

• We supported and served millions of customers and the communities in which the Firm operates. The Firm loaned or raised capital of more than $1.4 trillion for its clients, which included more than $10 billion of credit provided to more than 250,000 small businesses in the U.S., an increase of more than 50% over 2009.

• JPMorgan Chase also made substantial investments in the future of its businesses, including hiring more than 8,000 additional employees in the U.S. alone.

• Each stand-alone business had a top 1, 2 or 3 position.

• The Firm remains committed to homeowners, making loans and preventing foreclosures.

• The Firm benefited from an improvement in the credit environment during 2010. Compared with 2009, delinquency trends were more favorable and estimated losses were lower in the consumer businesses, although they remained at elevated levels, and the credit quality of the commercial and industrial loan portfolio across the Firm's wholesale businesses improved.

• Strong client relationships and continued investments for growth resulted in good performance across most of the Firm's businesses.

– Investment Bank (IB) had its second best revenue in history with an ROE of 17%, in line with through-the-cycle targets. Ranked #1 for Global Investment Banking Fees based on revenue.

– Retail Financial Services (RFS) added more than 150 new branches and 5,000 sales people, and opened more than 1.5 million net new checking accounts.

– Card Services rolled out new products and opened 11.3 million new accounts.

– Commercial Banking reported record revenue and net income.

– Treasury & Securities Services (TSS) grew assets under custody to $16.1 trillion.

– Asset Management (AM) reported record revenue.

185.    The 2011 Proxy further stated in regards to the Company's compensation:

Our actions are as important as our principles. In the past year, we undertook extensive internal reviews of our programs in light of the global economic environment, proposed and enacted legislation, and global regulatory initiatives. We have examined our policies and practices against multiple sources of regulatory guidance, and believe that our principles and practices are substantially consistent with recommended approaches.

Our compensation structure is designed to contribute to the achievement of the Firm's short-term and long-term strategic and operational objectives, while avoiding unnecessary or excessive risk-taking. We do this through a total compensation program comprised of an appropriate mix of fixed pay (base salary) and variable pay in the form of cash incentives and longterm, equity-based incentives. We deliver a lesser portion of compensation paid in cash annually and a larger portion in equity delivered over time and subject to continued performance of the Firm.

\* \* \*

**JPMorgan Chase's compensation framework is supported by our corporate governance and board oversight**.

• The Board of Directors, through the Compensation Committee, oversees our compensation programs, including overall accruals, mix of cash/stock, deferral percentages, and vehicles for delivering equity including terms and conditions.

• The Board of Directors regularly reviews financial performance, risk management and incentive compensation.

\* \* \*

**We approach our incentive compensation arrangements through an integrated risk, compensation and financial management framework**. JPMorgan Chase has in place a robust risk management discipline to capture, monitor, and control the risks created by its business activities. The goal is to not only manage the dynamic risks of the Firm, but also to create a culture of risk awareness and personal accountability. Any substantial introduction of emerging risks or increase in risks routinely taken would be either largely controlled by the risk limits in place or identified through the frequent risk reporting that occurs throughout the Firm. This risk discipline seeks to ensure that the potential for excessive risk taking by any individual, group, or business is controlled, regardless of the motivation.

Applying a disciplined financial management and measurement system is another important element that seeks to ensure that our financial performance results are risk-adjusted and can be measured objectively in light of performance targets, competitor performance, quality of earnings and the credit cycle.

\* \* \*

Our approach to financial measurement, risk and compensation management enables us to align employees' incentive compensation with their contributions to sustained, risk-adjusted financial performance.

\* \* \*

Beginning in 2008, the Compensation Committee reviewed with the Chief Risk Officer the risks that the Firm faces and elements of our organizational structure, management practices and compensation programs that would discourage unnecessary or excessive risk-taking, and will continue to do so going forward. In 2009, this review included the selfassessment of all incentive arrangements for the Firm. Beginning in 2009, the Compensation Committee determined to meet at least annually with one or more members of the Risk Policy Committee.

• There is appropriate separation between risk and control functions and the businesses they oversee, which is necessary to avoid potential conflicts of interest.

• Internal Audit conducts regular, independent audits of the Firm's compliance with its established policies and controls regarding incentive compensation management. Audit findings are reported to appropriate levels of management, and all adversely-rated audits are reported to the Audit Committee of the Board of Directors.

186.   The 2011 Proxy Statement further expanded on the Company's financial performance in Appendix D as follows:

**Overview of 2010 performance**

The Firm's financial condition and results of operations are discussed in detail in the Management's discussion and analysis (MD&A) section of the 2010 Annual Report. The Firm also reviews its business and priorities during an annual Investor Day, most recently held February 15, 2011. The 2010 Annual Report and presentation materials for the 2011 Investor Day may be found on our Web site at www.jpmorganchase.com under Investor Relations.

**JPMorgan Chase differentiated itself from other large financial services firms**. The Firm reported record net income of $17.4 billion for 2010, an increase of 48% from the prior year. Strong client relationships and continued investments for growth resulted in good results across most of the Firm's businesses, including record revenue and net income in Commercial Banking, record revenue in Asset Management and solid results across most other businesses. Credit trends in the Firm's credit card and wholesale businesses continued to improve. In our mortgage business, while charge-offs and delinquencies have improved, credit costs still remain at abnormally high levels and continue to be a significant drag on the Firm's returns. The Firm was successful in many fundamental areas, including the following:

• Return on common equity was 10% for the year, compared with 6% in the prior year, and return on tangible common equity was 15% for the year, compared with 10% in 2009.

• We continued to strengthen our fortress balance sheet during 2010, ending the year with a Tier 1 Common ratio of 9.8% and a Tier 1 Capital ratio of 12.1%. Total stockholders' equity at December 31, 2010, was $176.1 billion.

• We provided credit to and raised capital for our clients of more than $1.4 trillion during the year. These efforts included more than $10 billion of credit provided to over 250,000 small businesses in the U.S. in support of our communities, an increase of more than 50% over 2009.

• We grew the franchise in 2010, with new checking accounts in Retail Financial Services, credit card accounts in Card Services, new branches in Retail Banking, record net long-term inflows in Asset Management, growth in assets under custody at Treasury & Securities Services and sustained top Investment Bank rankings in virtually all major categories.

• We made substantial investments in the future of our businesses, including hiring more than 8,000 people in the U.S. alone.

• We remain committed to helping homeowners and preventing foreclosures. Since the beginning of 2009, the Firm has offered 1,038,000 trial modifications to struggling homeowners. Of the 285,000 modifications that the Firm has completed, more than half were modified under Chase programs, and the remainder were offered under government sponsored or agency programs.

**Investment Bank**

Net income was $6.6 billion compared with net income of $6.9 billion in 2009, reflecting lower net revenue and higher noninterest expense, partially offset by a benefit from the provision for credit losses and gains of $509 million from the widening of the Firm's credit spread on certain structured and derivative liabilities (compared with losses of $2.3 billion on the tightening of the spreads on those liabilities in the prior year). The decrease in net revenue was driven by a decline in Fixed Income Markets revenue as well as lower investment banking fees. The provision for credit losses was a benefit in 2010, compared with an expense in 2009, and reflected a reduction in the allowance for loan losses, largely related to net repayments and loan sales. Noninterest expense increased, driven by higher noncompensation expense, including increased litigation reserves, as well as higher compensation expense, including the impact of the U.K. Bank Payroll Tax. 2010 highlights and accomplishments include:

• We have nearly doubled our Global Markets revenue since 2007, and execute approximately 3 million trades daily across 110 trading desks.

• Retained its #1 Global IB fee ranking based on revenue; Ranked #1 in Global Debt, Equity and Equity-related; #2 in Global Long-Term Debt; #3 in Global Equity and Equity related; #4 in Global Announced M&A; and #1 in Global Syndicated Loans, based on volume (according to Dealogic).

• We helped clients raise $505 billion of capital, $18 billion more than any other firm (according to Dealogic):

– Almost $440 billion in global debt markets.

– Over $65 billion in global equity markets.

• We led the market in arranging or loaning over $350 billion to 420 clients globally (according to Dealogic).

• We helped raise nearly $90 billion for U.S. state and local governments, healthcare organizations, non-profits and educational institutions.

– We assisted California with a $10 billion bond issuance, the largest municipal transaction of 2010 (according to SDC Thomson).

• We executed 353 equity transactions (according to Dealogic), more than any other firm, including the two largest ever:

– General Motors: $23 billion.

– Agricultural Bank of China: $22 billion.

• We advised clients on 311 announced mergers and acquisitions globally with a 16% share (according to Dealogic).

• We expanded internationally; including growing headcount in China and Brazil over 40%.

• We completed the acquisition of select RBS Sempra assets, enabling us to offer comprehensive commodities solutions.

### Retail Financial Services

Net income was $2.5 billion, compared with $97 million in the prior year, driven by a lower provision for credit losses, partially offset by increased noninterest expense and lower net revenue. Net revenue decreased, driven by lower deposit related fees (including the impact of the legislative changes related to non-sufficient funds and overdraft fees), and lower loan balances. These decreases were partially offset by a shift to wider-spread deposit products, and growth in debit card income and auto operating lease income. The provision for credit losses decreased from the 2009 level, reflecting improved delinquency trends and reduced net charge-offs. The provision also reflected an increase in the allowance for loan losses for the purchased credit-impaired portfolio, partially offset by a reduction in the allowance for loan losses, predominantly for the mortgage loan portfolios. Noninterest expense increased from the prior year, driven by higher default-related expense for mortgage loans serviced, and sales force increases in Business Banking and bank branches. 2010 highlights and accomplishments include:

• We had strong growth across our Retail Banking franchise, including:

– Business Banking originations up 104% year over year.

– Branch mortgage originations up 48%.

– End-of-period deposits of $344.2 billion, up 3%.

– Checking accounts of 27.3 million, up 6%.

– Investment sales up 8%.

• We achieved record net income and returns in Auto Finance.

• We deepened our customer relationships by increasing the number of products and services held by our customers by 6.7% (from 6.26 to 6.68).

• We held the #1 deposit market share in key cities, including New York (16.7%), Dallas (13.6%), Houston (16.2%) and Chicago (12.9%).

• Since 2009, RFS has prevented twice as many foreclosures as it completed.

• We opened 17 Chase Homeownership centers across the country, bringing the total number of centers to 51, to provide one-on-one counseling to borrowers.

**Card Services**

Net income was $2.1 billion, compared with a net loss of $2.2 billion in the prior year, as a lower provision for credit losses was partially offset by lower net revenue. The decrease in net revenue was driven by a decline in net interest income, reflecting lower average loan balances, the impact of legislative changes and a decreased level of fees. These decreases were partially offset by a decrease in revenue reversals associated with lower net charge-offs. The provision for credit losses decreased from the prior year, reflecting lower net charge-offs and a reduction in the allowance for loan losses due to lower estimated losses. The prior-year provision included an increase to the allowance for loan losses. Noninterest expense increased due to higher marketing expense. 2010 highlights and accomplishments include:

• We achieved record high sales volume of $302 billion and increased our sales market share by 234bps since 2007, both excluding Washington Mutual.

• We added 11.3 million new Visa, MasterCard and private label credit card accounts.

• We processed 20.5 billion transactions through Chase Paymentech.

• Our Chase branch network continues to generate approximately 1.5 million new card accounts per year and more than 40% of revenue from new merchants for Chase Paymentech.

**Commercial Banking**

Net income was a record $2.1 billion, an increase of $813 million, or 64%, from the prior year, driven by a reduction in the provision for credit losses and record net revenue. The increase in net revenue was driven by growth in liability balances, wider loan spreads, higher net gains from asset sales, higher lending-related fees, an improvement in the market conditions

impacting the value of investments held at fair value, and higher investment banking fees; these were largely offset by spread compression on liability products and lower loan balances. The provision for credit losses decreased from 2009 and reflected a reduction in the allowance for credit losses, primarily due to stabilization in the credit quality of the loan portfolio and refinements to credit loss estimates. Noninterest expense increased slightly, reflecting higher headcount-related expense. 2010 highlights and accomplishments include:

• We retained our Top 3 leadership position nationally in market penetration and lead share (according to Greenwich Associates).

• We maintained our ranking as the nation's #1 multifamily lender (according to FDIC data), and improved our ranking to become the nation's #2 large middle market lender (according to Thomson Reuters).

• We achieved the #1 return on equity in our peer group at 26%.

• We delivered a record $1.3 billion in gross investment banking fees.

• As a leader in asset-based lending, we closed $3.7 billion in loans.

• We expanded our client base by adding more than 1,500 new middle market clients, and grew our international business by adding nearly 500 new clients overseas.

• We increased new and renewed lending to middle market companies by 9%.

• We continued to outperform our peers in credit quality with the lowest net charge-off ratio and the lowest loan-to-deposit ratio – we are the only bank under 100%.

• Acquired a highly performing and immediately accretive $3.5 billion multifamily loan portfolio.

• We demonstrated our commitment to supporting communities by extending more than $9 billion to over 600 government, not-for-profit, healthcare and educational institutions and we committed nearly $1.5 billion to create and retain more than 12,000 housing units of affordable housing in over 100 U.S. cities.

**Treasury & Securities Services**

Net income was $1.1 billion, a decrease of $147 million, or 12%, from the prior year, driven by higher noninterest expense, partially offset by a benefit from the provision for credit losses and higher net revenue. Worldwide Securities Services net revenue was relatively flat, as higher market levels and net inflows of assets under custody were offset by lower spreads in securities lending, lower volatility on foreign exchange, and lower balances on liability products. Treasury Services net revenue was relatively flat, as lower spreads on liability products were offset by higher trade loan and card product volumes. Noninterest expense for TSS increased, driven by

continued investment in new product platforms, primarily related to international expansion, and higher performance-based compensation expense. 2010 highlights and accomplishments include:

• We delivered growth in the following key business drivers: international electronic funds transfer volumes increased 20%, assets under custody increased 8%, and the number of wholesale cards issued grew 10%.

• We expanded our non-US banker sales force and increased technology expenditures by 23%.

• We provided clearing capabilities for clients in U.S. Dollars, Euro and 18 additional world currencies, and we are processing $7.5 trillion of global payments daily.

• We strengthened our international presence opening new branches in Mexico City, Sao Paulo and Riyadh/Saudi Arabia; opened new representative offices in Bangladesh and Abu Dhabi; and we expanded our capabilities in China, India, Australia, New Zealand, Malaysia, Philippines, Singapore, Thailand, Indonesia, Hong Kong, Taiwan, Brazil, Mexico, United Kingdom, Germany and France.

• We launched the first-ever Hong Kong Depositary Receipt ("HDR") listing on the Stock Exchange of Hong Kong ("SEHK").

• We remain the #1 clearer of U.S. dollars in the world, with more than 20% market share and we have been #1 in Automated Clearing House originations for the last three decades.

• We ranked #2 in Assets Under Custody with $16.1 trillion.

### Asset Management

Net income was $1.7 billion, an increase of $280 million, or 20%, from the prior year, on record revenue, largely offset by higher noninterest expense. The growth in net revenue was driven by the effect of higher market levels, net inflows to products with higher margins, higher loan originations, higher deposit and loan balances, and higher performance fees, partially offset by narrower deposit spreads. Noninterest expense increased due to higher headcount and performance-based compensation. 2010 highlights and accomplishments include:

• We increased our assets under supervision by 8% to a record $1.8 trillion during 2010 driven by the effect of higher market valuations, record net inflows of $69 billion to long-term products, and inflows in custody and brokerage products, offset partially by net outflows from liquidity products.

• We ranked #2 in long-term U.S. mutual fund flows.

• We hired 453 sales people – more than we have ever hired in one year.

• We managed nearly $500 billion in global liquidity assets on behalf of clients as the #1 money-market fund manager in the world.

• Our Private Banking business achieved its seventh consecutive year of positive revenue growth, achieving record revenues of $4.9 billion.

• We acquired a majority interest in Gávea Investimentos, a leading alternative asset management company in Brazil.

187.     These statements were materially false and misleading or omitted information necessary to not make them false and misleading in that (1) they did not disclose the true financial condition of the Company and (2) they did not disclose the true state of the Company's risk management structure.

188.     These false and misleading statements and/or omissions were material to the shareholder's decision to elect or reelect the Director Defendants to the Board.

189.     JPMorgan was harmed and suffered damages as a result of the shareholder's votes of the 2011 Proxy proposals.  Had they known the truth, shareholders would have voted against the Director Defendants who continued to harm the Company through their breaches of fiduciary duties and against the continued executive compensation plan in support of the executives who continued to harm the Company.

### 2. Misstatements and Omissions in the 2012 Proxy.

190.     The 2012 Proxy listed the following voting matters to be decided at the May 15, 2012 meeting:

> **Matters to be voted on:**
> • Election of directors
> • Ratification of appointment of PricewaterhouseCoopers LLP as our
>   independent registered public accounting firm for 2012
> • Advisory resolution to approve executive compensation
> • Shareholder proposals, if they are introduced at the meeting
> • Any other matters that may properly be brought before the meeting

191.     Shareholder proposals in the 2012 Proxy were political non-partisanship, independent director as chairman, shareholder action by written consent, loan servicing, corporate political contributions report, genocide-free investing, and stock retention.

192.    Like the 2011 Proxy, the 2012 Proxy made statements regarding risk appetite, Board oversight, and the JPMorgan code of conduct and ethics, and reported the following 2011 financial results:

**Appendix E**

**Overview of 2011 performance**

The Firm's financial condition and results of operations are discussed in detail in the Management's Discussion and Analysis of Financial Conditions and Results of Operations ("MD&A") section of the 2011 Annual Report. The Firm also reviews its business and priorities during an annual Investor Day, most recently held February 28, 2012. The 2011 Annual Report and presentation materials for the 2012 Investor Day may be found on our Website at www.jpmorganchase.com under Investor Relations.

In this appendix we summarize the 2011 priorities and achievements for the Firm, for each of the LOBs and for Global Finance.

JPMorgan Chase differentiated itself from other large financial services firms. The Firm reported record net income of $19.0 billion for 2011, an increase of 9% from the prior year and record earnings per share of $4.48, an increase of 13%. Record net income was driven by strong client relationships and reflected continued investments for growth across the Firm's businesses. The Firm's line of business results included record revenue and net income in Commercial Banking and record revenue in Asset Management. During 2011, the credit quality of the Firm's wholesale credit portfolio improved while delinquency trends in the consumer business modestly improved, though the rate of improvement seen earlier in 2011 slowed somewhat in the latter half of the year. Mortgage net charge-offs and delinquencies modestly improved, but both remained at elevated levels. Firmwide, net chargeoffs were down 48% compared with the prior year, and nonperforming assets were down 33%. The Firm was successful in many fundamental areas, including the following:

• Return on equity: Return on common equity ("ROE") was 11% for the year, compared with 10% in the prior year, and return on tangible common equity was 15%1 for the year, unchanged from 2010. Tangible book value per share was $33.692, an increase of 12% over the prior year.

• Fortress balance sheet: The Firm maintained its fortress balance sheet, ending the year with a strong Basel I Tier 1 Common ratio of 10.1%3 and a Tier 1 Capital ratio of 12.3%. Total stockholders' equity at December 31, 2011, was $183.6 billion. The Firm's strong capital position allowed it to repurchase $8.95 billion of common stock and warrants during 2011. Total deposits increased to $1.1 trillion, up 21% compared with the prior year.

• Providing credit and raising capital: The Firm provided credit and raised capital of over $1.8 trillion for its commercial and consumer clients, up 18% from the prior year, including $17 billion of credit provided to U.S. small businesses, up 52% over prior year. The Firm also raised capital or provided credit of $68 billion for more than 1,200 not-for-profit and government entities, including states, municipalities, hospitals and universities.

• Helping homeowners and preventing foreclosures: The Firm remains committed to helping homeowners and preventing foreclosures. Since the beginning of 2009, the Firm has offered more than 1.2 million mortgage modifications to struggling homeowners, of which approximately 452,000 were completed.

* * *

**Multi-year priorities**

In 2011, the Investment Bank continued to focus on the long-term strategic priorities established in 2010. Those goals and priorities include developing the Investment Bank's core client franchise, expanding in growth markets (International and Commodities), executing our technology reengineering program and prudently managing risk and capital. The following discusses the Investment Bank's priorities and accomplishments in more detail. Certain priorities (ROE, share of Global IB fees and share of Global Market revenues) are expressed quantitatively, while others are expressed qualitatively.

**Financial performance**

In 2011, the Investment Bank delivered net income of $6.8 billion on revenue of $26 billion. ROE was 17% on $40 billion of allocated capital, a result in line with our target of 17% +/- through–the–cycle that set several years ago. The IB also aspires to achieve a 10% share of Global IB fees and a 15% share of Global Markets revenue over the next several years. In 2011, the IB achieved an 8% share of Global IB fees (#1 ranking) and 15%1 share of Global Markets revenue (including Fixed Income, Commodities, and Equities).

**Clients**

The IB serves approximately 21,000 issuer and investor clients around the world. In 2011, the IB:

• Helped clients raise $430 billion of debt and equity capital

• Led the market in arranging or lending nearly $440 billion across 1,204 transactions

• Raised or provided $68 billion in capital for U.S. state and local governments, not-for-profits, healthcare organizations and educational institutions

• Executed 271 equity transactions, more than any other firm

• Advised clients on 332 announced mergers and acquisitions globally with an 18% share

**Growth**

Growth priorities for 2011 were to extend the Firm's international presence, build-out the Commodities franchise and execute our strategic technology reengineering program.

International — The IB footprint expanded internationally both directly and through development of the Global Corporate Bank. New capabilities were added in over 20 locations and 150 corporate bankers were hired. We also launched an EMEA Prime Brokerage platform and our China Securities JV began operations. An International Steering Committee was formed to supervise and coordinate these efforts across the Investment Bank, Asset Management and Treasury and Securities Services.

Commodities — In 2011, the IB completed the integration of select assets acquired from RBS Sempra last year. We are now one of the top three firms in this market with over 2,200 active clients.

Technology — The IB is in the third year of its Strategic Reengineering Program focused on trading platforms, OTC clearing requirements and our core processing infrastructure. Since 2008, we decommissioned 28 systems and realized $175 million in runrate savings. Further progress was made in enhancing equities electronic trading capabilities.

**Risk and Capital Management**

In 2011, the IB focused on credit and market risk discipline and efficient capital management. We reduced Risk Weighted Assets ("RWA") by over $80 billion and our year–end Basel III Tier 1 common ratio of 8.4% is one of the strongest in the industry. In 2012, we seek to continue to reduce RWA and prepare the Firm for new regulations.

**Values**

The IB's leadership includes maintaining the Firm's reputation and developing and retaining top talent. In 2011, we continued a focus on clients' long term interests to maintain their trust. Further, we fostered a collegial working environment and retained 98% of our top talent while managing through industry-wide adjustments in the structure and level of compensation.

**Consumer & Business Banking**

**Multi-year priorities**

In 2011, the goals of Consumer & Business Banking ("CBB") were to meet earnings targets, improve on the customer satisfaction/ customer service culture, maintain strong risk controls, and improve depth of management talent and reduce employee turnover. The following discusses CBB's

priorities in more detail, and the extent to which they were achieved during the year. In the following, certain priorities are expressed quantitatively, while others are expressed qualitatively.

**Financial performance**

For 2011, CBB achieved an ROE of 40% on net income of $3.8 billion, which was up 4% year-over-year. Revenue increased from $17.7 billion in 2010 to $18.0 billion in 2011, up 2% year-over-year.

* * *

**Growth**

Continued to show strong underlying growth in key business drivers year-over-year

• Average deposit balances increased 6%

• Number of branches increased by 240 (260 new builds compared with a target of 225+/-

• Business Banking loan originations of $5.8 billion up 24%

• Added 246 Chase Private Client locations in 2011, ending the year at 262

• Added over 3,800 personal bankers, sales specialists and client advisors in 2011

* * *

**Risk and control**

In 2011, we improved credit and fraud losses across CBB, by enhancing our fraud detection capability for checks, debit cards and internet payments and improving the customer experience by reducing holds on deposits and increasing funds availability. Our Business Banking portfolio losses are nearing pre-crisis levels and the credit performance of new vintages is appreciably better than previous years.

* * *

**Mortgage Banking**

**Multi-year priorities**

For 2011, goals and priorities for Mortgage Banking ("MB") were to improve the customer satisfaction and competitive position of the business, produce fair financial returns for shareholders, improve the risk and control environment (including addressing Consent Orders issued by banking regulators), deliver on technology strategy and processing improvements, and build a strong leadership and people platform to support the business. The following discusses Mortgage Banking's priorities in more detail, and the extent to which they were achieved during the year. In the following, certain priorities are expressed quantitatively, while others are expressed qualitatively.

**Financial performance**

In 2011, Mortgage Banking focused on working through legacy issues and creating a positive trend in overall business returns. Mortgage Banking net income was relatively consistent with 2010 despite significant non-recurring foreclosure-related and other expenses as 2011 net charge offs decreased $2.7 million from 2010. In addition, our mortgage servicing rights ("MSR") asset is expected to earn better returns over time.

Competitive position

In 2011, Mortgage Banking's priorities were improving market share, improving customer satisfaction, minimizing customer complaints and inventories, and restoring our reputation with key stakeholder groups. These goals were achieved in 2011. Strong volume and historically high margins in 2011 supported positive production results in 2011. In the third quarter of 2011, Chase moved from 3rd to 2nd in mortgage originations and maintained that position in the fourth quarter. A strong focus on customer facing activities across Mortgage Banking resulted in several important accomplishments. Chase rose from 12th to 5th in the J.D. Power mortgage originations survey in 2011, the largest improvement of any company. Customer satisfaction measures increased across all aspects of the business (origination, servicing, default and borrower assistance), and customer complaints were reduced 60% over the second half of the year. Issues related to compliance with the Servicemembers Civil Rights Act ("SCRA") were remediated and Mortgage Banking established a Military and Veterans Affairs office to increase focus on veteran programs and issues. The business developed key partnerships with community activists, improving the public's view of the business.

**Help homeowners and prevent foreclosures**

Since the beginning of 2009, we have offered 1.2 million modifications and completed approximately 452,000. In 2011, we continued to improve our business practices and make huge strides in our borrower assistance efforts. As of the end of the year, we have 82 Chase Homeownership Centers in 28 states and the District of Columbia to help customers under financial stress remain in their homes. Customer assistance specialists at these centers work one-on-one with homeowners to explain the options that might prevent a foreclosure, including loan modifications. To date, we have met with approximately 273,000 struggling homeowners and have held 1,800 outreach events for customers who need assistance.

**Risk and control**

In 2011, Mortgage Banking established a centralized Control organization and revamped the governance structure to foster control accountability across Mortgage Banking. In addition, a newly established Risk and Control executive steering committee reviewed performance against key risk measurement metrics, and enhanced risk management oversight. Mortgage

Banking completed several activities in response to the Consent Orders issued by banking regulators in 2011:

• Completed required technology changes for real estate owned ("REO"), payments, fees, investigations/complaints, foreclosure review, and document management

• Launched the Single Point of Contact tool and converted 3,400 relationship managers to customer assistance

• Received OCC approval of the implementation plan to address the requirements of the Consent Orders

**Technology and operations**

Implementing key technology initiatives and re-engineering servicing processes to capture efficiency improvements are critical to Mortgage Banking's longer term aim of returning the servicing and portfolio businesses to profitability. In 2011, the key technology accomplishment was the standardization of our three heritage mortgage systems into a common platform, addressing core processing differences, and improving controls on servicing activities.

**Employees**

In 2011, Mortgage Banking made several key changes with the aim of creating a best in class mortgage team. The management team and organization structure was reconstituted, improving control and management accountability. Borrower Assistance was created – a customer-centric organization focused on keeping customers in their homes. Mortgage Banking recruited highly experienced professionals from inside and outside the firm to strengthen business leadership. Firm-wide expertise and best practices were leveraged to improve Mortgage Banking capabilities and prepare the business for future success.

**Multi-year priorities**

Card Services' vision is to create lifelong, engaged relationships with customers by being a trusted provider of financial services. Card Services' goals and priorities were to 1) continue to grow sales and market share; 2) stabilize outstandings; 3) make progress against our commitment to investors; 4) continue to execute on strategy based on brands, rewards and customer experience; and 5) integrate Commercial Card, Auto and Student Lending businesses.

193.    These statements were materially false and misleading or omitted information necessary to not make them false and misleading in that (1) they did not disclose the true

financial condition of the Company and (2) they did not disclose the true state of the Company's risk management structure.

194.    These false and misleading statements and/or omissions were material to the shareholder's decision to elect or reelect the Director Defendants to the Board.

195.    JPMorgan was harmed and suffered damages as a result of the shareholder's votes of the 2012 Proxy proposals.  Had they known the truth, shareholders would have voted against the Director Defendants who continued to harm the Company through their breaches of fiduciary duties, and against the continued executive compensation plan in support of the executives who continued to harm the Company.

### 3. Misstatements and Omissions in the 2013 Proxy.

196.    The 2013 Proxy listed the following voting matters to be decided at the May 21, 2013 meeting:

> **Matters to be voted on:**
> • Election of directors
> • Ratification of appointment of PricewaterhouseCoopers LLP as our
>   independent registered public accounting firm for 2013
> • Advisory resolution to approve executive compensation
> • Amendment to the Firm's Restated Certificate of Incorporation to
>   authorize shareholder action by written consent
> • Reapproval of the Key Executive Performance Plan
> • Shareholder proposals, if they are introduced at the meeting
> • Any other matters that may properly be brought before the meeting

197.    The 2013 Proxy made the following statements regarding Compensation:

> Compensation Principles and 2012 Executive Compensation
>
> Compensation determinations are guided by the JPMorgan Chase Compensation Principles and Practices. As described starting at page 18 and in Appendix C at page 59, these principles include:
>
> • Maintaining strong governance: Independent Board oversight of the Firm's compensation principles and practices and their implementation

• Attracting and retaining top talent: A recognition that competitive and reasonable compensation helps attract and retain the high quality people necessary to grow and sustain our businesses

• Tying compensation to performance:

o A focus on the qualitative as well as the quantitative performance of the individual employee, the relevant line of business or function and the Firm as a whole

o A focus on multi-year, long-term, risk-adjusted performance and rewarding behavior that generates sustained value for the Firm through business cycles

o Performance assessments that are broad-based and balanced, including an emphasis on teamwork and a "shared success" culture

• Aligning with shareholder interests:

o A significant stock component (with deferred vesting) for shareholder alignment and retention of top talent

o Very strict limits or prohibitions on executive perquisites, special executive retirement severance plans, and no golden parachutes

• Integrating risk and compensation:

o Input into compensation determinations by risk and control functions

o Although awards are made with the expectation that they will vest in accordance with their terms, all awards contain strong recovery provisions, and additional risk-related recovery provisions apply to the Operating Committee, the Firm's most senior management group, and to a group of senior employees we refer to as Tier 1 employees with primary responsibility for risk positions and risk management

o Shares received by Operating Committee members are subject to robust retention requirements and a prohibition on hedging.


198.    The 2013 Proxy reported the following 2012 financial results:

**Appendix E 1**

**Overview of 2012 performance**

The Firm's financial condition and results of operations are discussed in detail in the Management's Discussion and Analysis of Financial Conditions and Results of Operations ("MD&A") section of the 2012 Annual Report. The Firm also reviews its business and priorities during an annual Investor Day, most recently held on February 26, 2013. The 2012 Annual Report and presentation materials for the 2013 Investor Day may be found on our Website at www.jpmorganchase.com under Investor Relations.

In this appendix we summarize the 2012 priorities and achievements for the Firm, for each of the LOBs and for Global Finance.

**JPMorgan Chase continued to differentiate itself as a leader across each of its businesses**. The Firm reported record net income of $21.3 billion for 2012, an increase of 12% from the prior year, and record earnings per share of $5.20, an increase of 16%. These results represent the third consecutive year of both record net income and a 15% return on tangible common equity. These results were driven by strong underlying performance across virtually all of the Firm's businesses, with strong lending and deposit growth, and included continued investments for growth. The Firm maintained its leadership positions and continued to grow market share in key areas of its franchise. During 2012, the Firm continued to see favorable credit conditions across its wholesale loan portfolios and strong credit performance in its credit card portfolio, where charge-offs remain at historic lows. The Real Estate Portfolios, while reporting elevated levels of losses, continued to show improvement as the U.S. housing market and economy continued to recover. The Firm was successful in many fundamental areas, including the following:

• Return on equity: Return on common equity ("ROE") was 11% for the year, compared with 11% in the prior year, and return on tangible common equity was 15% for the year, unchanged from 2011. Tangible book value per share was $38.75, an increase of 15% over the prior year.

• Fortress balance sheet: The Firm maintained its fortress balance sheet, ending 2012 with a strong Basel I Tier 1 Common ratio of 11.0% and a Tier 1 Capital ratio of 12.6%. Total stockholders' equity at December 31, 2012, was $204.1 billion. Total deposits increased to $1.2 trillion, up 6% compared with the prior year.

• Providing credit and raising capital: In 2012, the Firm provided credit and raised capital of over $1.8 trillion for its customers, corporate clients and the communities in which it does business, including $20 billion of credit provided to U.S. small businesses, up 18% over prior year. The Firm also raised capital or provided credit of $85 billion for nearly 1,500 nonprofit and government entities, including states, municipalities, hospitals and universities.

• Helping homeowners and preventing foreclosures: The Firm remains committed to helping homeowners and preventing foreclosures. Since the beginning of 2009, the Firm has offered more than 1.4 million mortgage modifications to struggling homeowners and of these, approximately 610,000 have achieved permanent modifications.

• Investing for the future: The Firm continued to grow the franchise and make substantial investments for the future:

— Consumer & Business Banking added 106 net branches; added approximately 950 Chase Private Client branch locations in 2012

— Held top Investment Bank rankings in virtually all major categories

— Continued to build out international Prime Brokerage platform launched in 2011

— Global Corporate Bank expanded to nearly 300 bankers

— Commercial Banking continued building its Middle Market business in expansion markets

— Asset Management hired 80 client advisors and investment professionals as part of ongoing expansion investments

— Hired nearly 5,000 U.S. military veterans since the beginning of 2011.

199.    These statements were materially false and misleading or omitted information necessary to not make them false and misleading in that (1) they did not disclose the true financial condition of the Company and (2) they did not disclose the true state of the Company's risk management structure.

200.    These false and misleading statements and/or omissions were material to the shareholder's decision to elect or reelect the Director Defendants to the Board.

201.    JPMorgan was harmed and suffered damages as a result of the shareholder's votes of the 2013 Proxy proposals.  Had they known the truth, shareholders would have voted against the Director Defendants who continued to harm the Company through their breaches of fiduciary duties, and against the continued executive compensation plan in support of the executives who continued to harm the Company.

## VI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

202.    Plaintiff brings this action derivatively in the right and for the benefit of JPMorgan to redress injuries suffered, and to be suffered, by JPMorgan as a direct result of breaches of fiduciary duty, waste of corporate assets, and gross mismanagement, as well as the aiding and abetting thereof, by the defendants.  JPMorgan is named as a nominal defendant

solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

203.    Plaintiff and her counsel will adequately and fairly represent the interests of JPMorgan in enforcing and prosecuting its rights.

204.    Plaintiff is and was, at times relevant hereto, an owner and holder of JPMorgan stock, and remains a shareholder of the Company.

205.    Plaintiff incorporates by reference into this section all the foregoing factual allegations, which demonstrate that demand on the Board of Directors is futile.

206.    At the time Plaintiff brought this action, JPMorgan had ten directors. In situations involving an even number of board members, a derivative plaintiff must establish that at least half the board members lack independence or are interested. Demand on this board is futile since at least five of the current ten members of the JPMorgan are not disinterested and cannot fairly and adequately evaluate any demand made on the JPMorgan Board of Directors.

207.    Based upon the Defendants' acts and omissions in direct violation of their fiduciary duties of care, good faith, honesty and loyalty, a pre-suit demand on the JPMorgan Board of Directors to bring the claims asserted in this Complaint is excused as a futile and useless act. JPMorgan's Board of Directors personally profited from the wrongdoing alleged in this Complaint. In fact, it was the JPMorgan Board of Directors who had the largest financial incentive for engaging in the misconduct alleged in this Complaint, particularly because JPMorgan's involvement in the subprime business was a key driver for JPMorgan's profitability, which significantly bolstered the compensation to JPMorgan executives and directors. The Directors had final supervision and oversight over JPMorgan's business operations, and permitted and/or authorized JPMorgan to engage in illegal and improper conduct described

above, in violation of their duties of oversight. The lack of internal controls at JPMorgan and the push for profitability without regard to risks to the Company resulted in massive harm to JPMorgan.

208. The fact that the Defendants allowed and/or authorized JPMorgan to enter into the conduct alleged herein without proper internal controls, procedures, and risk management policies is an abdication of the responsibilities of the Defendants. As fiduciaries of JPMorgan, the Defendants each had a duty to understand and be aware of JPMorgan's business operations, in particular those business operations that constitute a major portion of JPMorgan's revenue and profits. In this case, the Defendants had a duty to understand that the subprime mortgage business was a major part of JPMorgan's profits and that internal controls, procedures and policies were necessary to ensure that this business was done legally and properly. In addition, Defendants had a duty to implement proper rules, regulation, or internal controls to prevent manipulative bidding strategies in the electricity markets and the manipulation of LIBOR-related benchmark interest rates, and implement effective policies, procedures to prevent violations of the Bank Secrecy Act and of the Foreign Corrupt Practices Act.  JPMorgan's executives and directors also had a fiduciary duty to ensure that the Proxy Statements described herein contained accurate and truthful information and were not materially false and misleading. Instead, the JPMorgan Board of Directors failed to implement internal controls, policies and procedures and/or provide effective oversight and supervision of proper policies and procedures to prevent JPMorgan from engaging in illegal and improper conduct.

209. Plaintiff has not made any demand on JPMorgan's Board of Directors to investigate and prosecute the malfeasance alleged herein. Such a demand is a wasteful and futile act, and therefore excused, in this case because: (i) making a demand would be futile since the

- 94 -

majority of JPMorgan's directors are not able to conduct an independent and objective investigation of the alleged wrongdoing; and (ii) the wrongful conduct of defendants is not subject to protection under the business judgment rule. Under such circumstances, the demand requirement is excused since making such a demand on the Board of Directors would be futile.

### A.  Demand Is Futile As To Defendant Dimon

210.    Dimon faces substantial likelihood of liability for his individual misconduct. He has been named as a defendant in at least one federal class action in the Southern District of New York alleging that he and the Company violated Section10(b) of the Securities Exchange Act of 1934 Act and Rule 10b-5 thereunder when he disseminated or approved false statements regarding JPMorgan's business operations. If Dimon pursued this derivative action, it would expose his own repeated misconduct in conducting the operations of JPMorgan.

211.    Dimon personally benefitted from the alleged wrongdoing, and made $134,147,916 from 2005 to 2012. Since his compensation was determined by the Compensation & Management Development Committee, he is also financially beholden to that Committee and its members, and is unable to fairly and independently evaluate any claims against them.

212.    Dimon cannot render an independent decision to pursue the actions because he is and was a high-ranking offer of JPMorgan and allowed the various wrongdoings to occur throughout his tenure as CEO. As JPMorgan's proxy filings concede, Dimon does not meet the independence standards of the New York Stock Exchange and thus is not considered to be independent and objective by the Company. Moreover, Dimon personally oversaw JPMorgan's shift towards the origination, securitization, marketing and sale of subprime RMBS. He also issued misleading statements and concealed material facts, as listed above, regarding the extent of JPMorgan's involvement in the subprime mortgage market and the extent of JPMorgan's

culpability for such involvement. Dimon therefore faces substantial likelihood of liability for breaching his fiduciary duties to JPMorgan shareholders.

213.    Moreover, Dimon is not independent because he has other family members employed by JPMorgan. The father of Dimon has been employed by the Company as a broker since 2009, and for 2012 received compensation of $1,599,616, including annual salary, commissions, and an equity award.

**B.  Demand Is Futile As To Defendant Bell**

214.    Bell faces a substantial likelihood of liability for his individual misconduct. Bell was a director throughout the relevant time period and had a duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true and correct. He allowed Dimon to make misstatements and to conceal material facts from the public. Bell's authorization of such misstatements and concealments of material fact constitute a breach of fiduciary duty, for which Bell faces a substantial likelihood of liability. For these reasons, Bell cannot adequately and appropriately consider a demand on the JPMorgan Board of Directors.

215.    As a Board member, Bell made a base total of approximately $245,000 each year from the company, including cash and stock awards. To maintain his lucrative compensation, and ensure the value of his shares, Bell has an interest in continuing to cover up for Defendant Dimon's misconduct, as well as his own. As such, Bell cannot independently consider a demand on the board, both to protect himself and to protect Dimon.

216.    Bell is a member of the Audit Committee and thus bears an even higher standard of duty to JPMorgan because of the responsibilities specifically delegated to those committee members by JPMorgan's Board of Directors. As an Audit Committee member, Defendant Bell

was required to review the Company's financial statements and press releases for accuracy and to make any needed corrections. Bell either failed or refused to do so and allowed Dimon and others to make and continue to make misleading statements or omit the company's exposure to risk. For these reasons, Bell cannot adequately and appropriately consider a demand on the JPMorgan Board of Directors.

### C.  Demand Is Futile As To Defendant Bowles

217.   Bowles faces a substantial likelihood of liability for her individual misconduct. Bowles was a director throughout the relevant time period and had a duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true and correct. She allowed Dimon to make misstatements and to conceal material facts from the public. Bowles's authorization of such misstatements and concealments of material fact constitute a breach of fiduciary duty, for which Bowles faces a substantial likelihood of liability. For these reasons, Bowles cannot adequately and appropriately consider a demand on the JPMorgan Board of Directors.

218.   Since 2006, as a Board member, Bowles made a base total of approximately $245,000 each year from the company, including cash and stock awards. To maintain her lucrative compensation, and ensure the value of her shares, Bowles has an interest in continuing to cover up for Defendant Dimon's misconduct, as well as her own.

219.   Bowles is a member of the Audit Committee and thus bears an even higher standard of duty to JPMorgan because of the responsibilities specifically delegated to those committee members by JPMorgan's Board of Directors. As an Audit Committee member, Defendant Bowles was required to review the Company's financial statements and press releases for accuracy and to make any needed corrections. Bowles either failed or refused to do so and

allowed Dimon and others to make and continue to make misleading statements or omit the company's exposure to risk. For these reasons, Bowls cannot adequately and appropriately consider a demand on the JPMorgan Board of Directors.

220.     Bowles cannot render an independent decision because Bowles' relationship with JPMorgan prevents her from independently considering a demand. Bowles is the Chairperson of Springs Industries, Inc. and its subsidiaries have all benefited from extensions of credit from JPMorgan. Since Dimon, as CEO, has control over the credit lines of Bowles's company, Bowles cannot render an independent judgment as to any demand made on JPMorgan's Board of Directors.   Moreover, JPMorgan is currently acting as financial advisor to Springs Industries with respect to the sale of Springs and anticipates participating in financing for the potential acquisition. Director Crandall Bowles is Chairman of Springs Industries, and she and her family own approximately 48% of the shares of Springs Industries.

### D.  Demand Is Futile To Defendant Burke

221.     Burke faces a substantial likelihood of liability from his individual misconduct. Burke was a director throughout the relevant time period and had a duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true and correct. He allowed Dimon to make misstatements and to conceal material facts from the public. Burke's authorization of such misstatements and concealments of material fact constitute a breach of fiduciary duty, for which Burke faces a substantial likelihood of liability. For these reasons, Burke cannot adequately and appropriately consider a demand on the JPMorgan Board of Directors.

222.     Burke is on the Compensation & Management Development Committee and the Corporate Governance and Nominating Committee. Burke is responsible for determining the

compensation awarded to Dimon. Burke was in a position to know that the large-scale origination, securitization, marketing and sale of subprime RMBS significantly boosted JPMorgan's profits, allowing Burke to pay out large compensation to Dimon. Burke therefore cannot fairly adjudicate any demand because of his personal involvement in awarding large compensation to Dimon.

223.    Since 2004, as a Board member, Burke made a base total of approximately $245,000 each year from the company, including cash and stock awards. To maintain his lucrative compensation, and ensure the value of his shares, Burke has an interest in continuing to cover up for Defendant Dimon's misconduct, as well as his own.

224.    Burke is the Executive Vice President of Comcast. Comcast and its subsidiaries have benefited from extensions of credit provided by JPMorgan. Since Dimon, as CEO, has control over the credit lines of the company that Burke serves as a senior officer, Burke cannot render an independent judgment as to any demand made on JPMorgan's Board of Directors.

### E.  Demand Is Futile As To Defendant Crown

225.    Crown faces a substantial likelihood of liability for his individual misconduct. Crown was a director throughout the relevant time period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. He allowed Dimon to make misstatements and to conceal material facts from the public. Crown's authorization of such misstatements and concealments of material fact constitute a breach of fiduciary duty, for which Crown faces a substantial likelihood of liability. For these reasons, Crown cannot adequately and appropriately consider a demand on the JPMorgan Board of Directors.

226.    Since 2004, as a Board member, Crown made a base total of approximately $245,000 each year from the company, including cash and stock awards. To maintain his lucrative compensation, and ensure the value of his shares, Crown has an interest in continuing to cover up for Defendant Dimon's misconduct, as well as his own. Crown also earned $40,000 of this was for his service on the Compliance committee and an additional $42,500 for his service as a member of the Mortgage Compliance committee.

227.    Crown is a member of JPMorgan's Risk Policy Committee and as such has a responsibility to ensure the implementation and enforcement of adequate risk policy controls at JPMorgan. Crown was a member of the Risk Policy Committee during 2005, 2006, 2007 and 2008, and Chair of the Committee during 2006, 2007 and 2008. In particular, Crown was responsible for ensuring that JPMorgan appropriately managed risk. In this case, the company was exposed to significant risk from engaging in high risk subprime mortgage loan origination, securitization, marketing and sales. Crown knew or should have known that JPMorgan was exposing itself to billions of dollars in losses based on subprime loans with borrowers that did not have a strong credit history. Crown knew or should have known that JPMorgan would face serious potential legal, regulatory and criminal risks for engaging in illegal activities, including the marketing and sale of RMBSs. Once he was informed of the risks and potential losses, he had a duty to disclose this information to the shareholders. Crown did not, and violated his fiduciary duty to do so.

228.    Crown is also president of Henry Crown and Company, a family-owned investment company. Crown has benefited from extensions of credit provided by JPMorgan to Henry Crown and other Crown owned entities. Additionally, JPMorgan leases office space and retail space from subsidiaries of companies in which Crown and members of his immediate

family have indirect ownership interests. Crown has also benefited from charitable contributions by JPMorgan to organizations Crown has served as a trustee. For these reason, Crown is not independent of Dimon and JPMorgan and cannot adequately evaluate the claims set forth in this Complaint.

### F.  Demand Is Futile To Defendant Jackson

229.    Jackson faces a substantial likelihood of liability for his individual misconduct. Jackson was a director throughout the relevant time period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. He allowed Dimon to make misstatements and to conceal material facts from the public. Jackson's authorization of such misstatements and concealments of material fact constitute a breach of fiduciary duty, for which Jackson faces a substantial likelihood of liability. For these reasons, Jackson cannot adequately and appropriately consider a demand on the JPMorgan Board of Directors.

230.    Since 2004, as a Board member, Jackson made a base total of approximately $245,000 each year from the company, including cash and stock awards. $45,000 of Jackson's compensation was for his service as a member of the Mortgage Compliance Committee. To maintain his lucrative compensation, and ensure the value of his shares, Jackson has an interest in continuing to cover up for Defendant Dimon's misconduct, as well as his own.

231.    Jackson is a member of the Audit Committee and thus bears an even higher standard of duty to JPMorgan because of the responsibilities specifically delegated to those committee members by JPMorgan's Board of Directors. As an Audit Committee member, Defendant Jackson was required to review the Company's financial statements and press releases for accuracy and to make any needed corrections. Jackson either failed or refused to do so and

allowed Dimon and others to make and continue to make misleading statements or omit the company's exposure to risk. For these reasons, Jackson cannot adequately and appropriately consider a demand on the JPMorgan Board of Directors.

232.    Defendant Jackson has also benefited from extensions of credit provided by JPMorgan directly to him. As CEO, Dimon is in a position to influence the extension of credit, so Jackson is not independent of Dimon or JPMorgan.

**G.  Demand Is Futile As To Defendant Raymond**

233.    Raymond faces a substantial likelihood of liability for his individual misconduct. Raymond was a director throughout the relevant time period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. He allowed Dimon to make misstatements and to conceal material facts from the public. Raymond's authorization of such misstatements and concealments of material fact constitute a breach of fiduciary duty, for which Raymond faces a substantial likelihood of liability. For these reasons, Raymond cannot adequately and appropriately consider a demand on the JPMorgan Board of Directors.

234.    Raymond is on the Compensation & Management Development Committee and the Corporate Governance and Nominating Committee. Raymond is thus responsible for determining the compensation awarded to officers, including Dimon. Raymond therefore cannot fairly adjudicate any demand on the Board, including Dimon, because of his personal involvement in awarding large compensation to Dimon.

235.    Since 2001, Raymond has received $2,312,078 from JPMorgan, including about $245,000 each year in an annual base payment of cash and stock awards. To maintain his lucrative compensation, and ensure the value of his shares, Raymond had a continued personal

financial interest in covering up Dimon's wrongdoing and as such is not able to fairly and appropriately adjudicate any demand made on the JPMorgan Board of Directors.

### H.  Demand Is Futile As To Defendant Weldon

236.   Weldon faces a substantial likelihood of liability for his individual misconduct. Weldon was a director throughout the relevant time period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. He allowed Dimon to make misstatements and to conceal material facts from the public. Weldon's authorization of such misstatements and concealments of material fact constitute a breach of fiduciary duty, for which Weldon faces a substantial likelihood of liability. For these reasons, Weldon cannot adequately and appropriately consider a demand on the JPMorgan Board of Directors.

237.   Since 2005, as a Board member, Weldon has received an annual base payment of about $245,000 in cash and stock awards. To maintain his lucrative compensation, and ensure the value of his shares, Raymond had a continued personal financial interest in covering up Dimon's wrongdoing and as such is not able to fairly and appropriately adjudicate any demand made on the JPMorgan Board of Directors.

238.   Weldon is on the Compensation & Management Development Committee and the Corporate Governance and Nominating Committee. Weldon is thus responsible for determining the compensation awarded to officers, including Dimon. Weldon therefore cannot fairly adjudicate any demand on the board, including Dimon, because of his personal involvement in awarding large compensation to Dimon.

239.    Further, Weldon was the CEO of Johnson & Johnson. JPMorgan has provided extension of credit to Johnson & Johnson and its subsidiaries. Dimon, as CEO, has control over the extension of credit. Weldon in not independent of Dimon or JPMorgan.

## I.   JPMorgan's Current Board Of Directors Violated The Fiduciary Duties They Owed To The Company And To Its Shareholders

240.    The acts complained of constitute violations of the fiduciary duties owed by JPMorgan's officers and directors and are incapable of ratification.

241.    The JPMorgan Board of Directors cannot be relied upon to reach a truly independent decision whether to commence the demanded action against themselves and the officers responsible for the misconduct alleged in this derivative complaint because, among other things, the Board is currently dominated by the Individual Defendants, who were personally and directly involved in the acts of mismanagement, abuse of control and waste alleged and who each approved the actions complained of, and to whose directives and views the Board has consistently acceded and will continue to accede. None of them are in a position to fairly evaluate their own misconduct in this case.

242.    This domination of JPMorgan's Board of Director prevents it from validly exercising its business judgment in a fair and neutral manner, and renders it incapable of reaching an independent decision whether to accept any demand by Plaintiff to address the wrongs detailed herein.

243.    A majority of the directors received personal and financial benefits while they caused or permitted JPMorgan to engage in the extensive misconduct detailed in this derivative complaint.

## VII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Against the Individual Defendants for Breach of Fiduciary Duty

244.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

245.    The Individual Defendants owed and owe JPMorgan fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe JPMorgan the highest obligation of good faith, fair dealing, loyalty, candor, and due care.

246.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of good faith, fair dealing, loyalty, candor, and due care.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within JPMorgan, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

247.    In addition, each of the Individual Defendants breached his or her duty of loyalty to the company by putting his or her own pecuniary interests above those of the company. The Individual Defendants breached their duty of good faith, fair dealing, loyalty, candor, and due care by their failures in: the implementation of proper rules, regulation, or internal controls to prevent manipulative bidding strategies in the electricity markets and the manipulation of LIBOR-related benchmark interest rates; the implementation of effective policies and procedures to prevent violations of the Bank Secrecy Act and of the Foreign Corrupt Practices Act; the solicitation of proxies from the Plaintiff and other JPMorgan shareholders by means of Proxy Statements which contained false and misleading statements and which omitted to state material facts that were necessary to make the statements contained therein not false and misleading; effective oversight and supervision; and effective due diligence and quality control processes

- 105 -

which allowed high risk investments containing subprime, high risk mortgage loans that had a high probability of default to be represented as low risk investments, as detailed herein. These improper practices wasted the Company's assets, and caused JPMorgan to incur substantial damage.

248.    Each of the Individual Defendants failed to implement proper rules, regulation, or internal controls to prevent manipulative bidding strategies in the electricity markets and the manipulation of LIBOR-related benchmark interest rates. Each of the Individual Defendants failed to implement effective policies and procedures to prevent violations of the Bank Secrecy Act and of the Foreign Corrupt Practices Act. Each of the Individual Defendants permitted and/or authorized JPMorgan to become heavily exposed to the subprime mortgage business, without regard for risk. Each of the Individual Defendants permitted and/or authorized JPMorgan to weaken its underwriting standards for mortgage loan originations, securitize high risk, low quality subprime mortgages into RMBS and then market and sell those low quality subprime RMBS through fraudulent and misleading representations and through the concealment of material facts. Each of the Individual Defendants utterly failed to implement any meaningful or effective reporting or information system or controls in regards to JPMorgan's subprime mortgage business at any level of the process, consciously failed to monitor or oversee JPMorgan's subprime mortgage business and knowingly failed to discharge their fiduciary obligations to JPMorgan. Considering the nature and risks associated with the RMBS business, the Individual Defendants abdicated their fiduciary obligations by knowingly allowing JPMorgan's standards to deteriorate at every level of the subprime mortgage business, from origination to securitization to marketing and sales.

249.    Each of the Individual Defendants also breached his or her duty of loyalty by concealing JPMorgan's involvement in the illegal RMBS sales through fraudulent and misleading representations and through the concealment of material facts.  Each Individual Defendant put his or her own desire to avoid reputational and litigation risk before the best interests of the company.

250.    Each of the Individual Defendants failed to implement effective policies, procedures, or controls designed to reasonably ensure that information- such as the information culminating in the October 2008 report to SOCA- obtained in the course of JPMorgan's other lines of business, was communicated to anti-money laundering compliance personnel based in the United States.  In addition, each of the Individual Defendants failed to implement effective policies, procedures, or controls designed to reasonably ensure that information about United States-based clients, obtained by JPMorgan in its business abroad, was communicated to anti-money laundering compliance personnel based in the United States. These systemic deficiencies reflected a failure to maintain adequate policies, procedures, and controls to ensure compliance with the BSA and regulations prescribed thereunder and to guard against money laundering.

251.    The Individual Defendants are also liable for failing to implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to: (a) monitor and prevent JPMorgan's officers, directors and employees from failing to comply with all applicable legal obligations and requirements; (b) monitor and prevent JPMorgan's officers, directors and employees from engaging in illegal and/or fraudulent misconduct; (c) remain informed as to JPMorgan's internal controls and, upon receipt of notice of information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; and (d) promote a corporate climate that emphasized

compliance with securities laws instead of the systemic violation of applicable legal requirements in the pursuit of illegal gain.

252.   Defendants abused the trust reposed in them by virtue of their positions and breached their fiduciary duty of loyalty by utterly abdicating their duty of oversight. As a result of their sustained and systematic failure to exercise oversight, the Individual Defendants caused or allowed JPMorgan's business to be conducted in violation of legal requirements and regulations known to them.

253.   Defendants specifically owed and owe JPMorgan the highest obligation of good faith and loyalty in the administration of the affairs of JPMorgan, including to conduct adequate due diligence in regards to its business operations, particularly those high risk business operations that are key profit centers for the company and sources of significant risk. As directors and officers of JPMorgan, the Individual Defendants were and are required to use their abilities to control and manage JPMorgan in a fair, just and equitable manner in order to ensure that the company complied with applicable laws, to refrain from abusing their positions of control, and not to favor their own interests at the expense of JPMorgan and its shareholders. Defendants violated their fiduciary duties to JPMorgan, including without limitation their duties of good faith, honesty and loyalty

254.   Defendants participated in or had knowledge of JPMorgan's illegal activities and profited thereby acted intentionally, which constitutes an additional breach of the fiduciary duty owed to the company.

255.   By their acts and omissions alleged herein, each of the Individual Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently

managing the assets and business of JPMorgan in a manner consistent with the best interest of JPMorgan and its shareholders.

256.    The wrongful conduct particularized herein was not due to an honest error in judgment, but rather to the Individual Defendants' gross mismanagement, bad faith and/or reckless disregard of the rights and interests of JPMorgan, and it shareholders. Defendants made the decisions subject to this action for their own pecuniary gain.

257.    As a result of the foregoing, the Individual Defendants have participated in harming JPMorgan and have breached fiduciary duties owed to JPMorgan. Furthermore, the Individual Defendants knowingly aided, encouraged, cooperated and/or participated in, and substantially assisted the other Defendants in the breaches of their fiduciary duties.

258.    As a result of the Individual Defendants' wrongful conduct, JPMorgan has suffered and continues to suffer economic losses and non-economic losses, all in an amount to be determined according to proof at the time of trial.   As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, JPMorgan has suffered billions of dollars in damages, including, but not limited to: **$410 million** to settle accusations that the Company manipulated electricity prices, **$60 million** as a fine by the Office of the Comptroller which "found that [JPMorgan] engaged in unfair billing practices for certain credit card 'add-on products' by charging consumers for credit monitoring services that they did not receive," **$2.32 billion** paid to  European Union regulators for colluding to manipulate LIBOR-related benchmark interest rates, **$4.5 billion** as settlement with 21 major institutional investors, ending mortgage repurchase and servicing claims, **$13 billion** to settle a host of federal government and state lawsuits alleging that the Company and its subsidiaries made false statements about the quality of mortgage-backed securities it sold prior to the financial crisis, and over **$2.6 billion**

because the Company failed to warn law enforcement officials about Madoff's $65 billion Ponzi scheme.   JPMorgan faces substantial additional damages including, among other things, reputational and other harm that may arise from ongoing civil and criminal investigations.

259.   The acts of each of the Individual Defendants named herein were done maliciously, oppressively, and with intent to defraud, and Plaintiff, derivatively on behalf of JPMorgan, is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

260.   Plaintiff, on behalf of JPMorgan, has no adequate remedy at law.

### SECOND CAUSE OF ACTION
### Against the Individual Defendants for Waste of Corporate Assets

261.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

262.   As a result of the Individual Defendants' failure to implement adequate internal procedures and controls to ensure compliance with state and federal laws and to ensure that that the Company's Registration Statement was accurate, JPMorgan is and has been subject to numerous lawsuits and investigations.   The Individual Defendants have caused JPMorgan to waste its assets by forcing it to defend itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

263.   In addition, the Individual Defendants have caused JPMorgan to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

264.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

265.    Plaintiff, on behalf of JPMorgan, has no adequate remedy at law.

### THIRD CAUSE OF ACTION
### Against the Individual Defendants for Unjust Enrichment

266.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

267.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of JPMorgan.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to JPMorgan.

268.    Defendants profited by engaging in the wrongful conduct set forth above. These benefits should not be held or retained by the Individual Defendants and should be disgorged back to the company.

269.    Individual Defendants' enrichment is directly and causally related to the detriment of JPMorgan.

270.    These benefits were accepted by Individual Defendants under such circumstances that it would be inequitable for them to be retained without payment.

271.    Plaintiff, as a shareholder and representative of JPMorgan, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

272.    Plaintiff, on behalf of JPMorgan, has no adequate remedy at law

## FOURTH CAUSE OF ACTION
### Derivatively Against the Director Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9

273.   This claim for relief, the fourth cause of action, is not based on any allegations of knowing or reckless conduct by any Defendant. This claim does not allege, and does not sound in, fraud, and Plaintiff disclaims any reliance upon or reference to allegations of fraud.

274.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

275.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this tile [15 U.S.C. § 781]."

276.   SEC Rule 14a-9, promulgated pursuant to Section 14(a), prohibits the issuance of any proxy statement "which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." 17 C.F.R. § 240.14a-9(a).

277.   Defendants Dimon, Bowles, Burke, Cote, Crown, Futter, Jackson, Raymond, and Weldon issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to shareholders that were contained in the Company's Proxy Statements  issued on April 7, 2011, April 4, 2012, and April 10, 2013.  In addition Bell issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to shareholders that were contained in the Company's Proxy Statements  issued on

April 4, 2012 and April 10, 2013 and Defendants Gray and Novak issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to shareholders that were contained in the Company's Proxy Statements  issued on April 7, 2011 and April 4, 2012.  The Proxy Statements contained proposals to JPMorgan shareholders that they vote to elect or reelect these Defendants to hold office during their respective periods,[5] approve executive compensation, and approve or disapprove the shareholder resolutions. The Proxy Statements, however, misrepresented and failed to disclose the true financial condition of the Company and the true nature of the strength and efficacy of the Company's internal controls particularly in regards to risk. The truth concerning the Defendants' misleading statements was not fully revealed until after JPMorgan's illicit practices came to light.   By reasons of the conduct alleged herein, these Defendants, who caused the issuance of the proxies, violated section 14(a) of the Exchange Act.

278.    The Director Defendants provided information which was contained in the Proxy Statements, allowed their names to be used in connection with the Proxy Statements and the solicitation of shareholder votes, had a substantial financial interest in the outcome of the votes being sought by the Proxy Statements, would have a continuing material relationship with JPMorgan following the vote on the issues presented in the Proxy Statements, solicited votes under the Proxy Statements, and caused the Proxy Statements to be disseminated to JPMorgan's shareholders through the use of the United States mails and the means and instrumentalities of interstate commerce. The Director Defendants solicited proxies from the Plaintiff and other JPMorgan shareholders by means of proxy statements which contained false and misleading statements and which omitted to state material facts that were necessary to make the statements contained therein not false and misleading.

---

[5] The one exception being that there was no proposal to reelect Gray and Novak in the April 4, 2012 proxy.

279.    In the Proxy Statements, Plaintiff and all other JPMorgan shareholders were solicited to vote to approve the election or reelection of the Director Defendants and approve executive compensation.  A shareholder vote was required to approve these proposals. Thus, the Proxy Statements were an essential causal link in the accomplishment of these proposals.

280.    These Director Defendants in the exercise of reasonable care should have known the truth about JPMorgan's true financial condition and state of the Company's internal risk controls, but failed to disclose such information, by supplementing the Proxy Statement or otherwise, before shareholders voted.

281.    The misrepresented or omitted facts are material because under all the circumstances, there is a substantial likelihood that a reasonable shareholder would consider the false and misleading statements or omitted facts important in deciding how to vote on the Proxy Statements or a material part of the mix of information available to shareholders in deciding how to exercise their voting rights. Thus, shareholders were denied the opportunity to make an informed decision in voting on the election or reelection of directors and executive compensation.

282.    None of the materially false and misleading statements contained in the Proxy Statements, or material facts omitted therefrom, were known to Plaintiff or other JPMorgan shareholders when they voted on the matters presented to them in the Proxy Statements.

283.    JPMorgan was harmed and suffered damages as a result of the continued election or reelection of the directors and the continued executive compensation which was approved through the use of a proxy statement in violation of Section 14(a) and Rule 14a-9.

284.    Plaintiff, on behalf of JPMorgan, thereby seeks relief for damages inflicted upon the Company in connection with the improper elections and reelections of the Defendants Dimon, Bell, Bowles, Burke, Cote, Crown, Futter, Jackson, Raymond, Weldon, Gray, and Novak; the improper approval of executive compensation; and improper disapproval of various

shareholder proposals - which approvals and disapprovals were all based upon the misleading and incomplete proxy materials.  Plaintiff, on behalf of JPMorgan, also seeks to void the election of Defendants Dimon, Bell, Bowles, Burke, Crown, Jackson, Raymond, and Weldon.[6]

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of JPMorgan, demands judgment as follows:

A.       Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934, and unjust enrichment;

B.       Awarding a preliminary and/or permanent injunction precluding JPMorgan and its Board of Directors from continuing to operate JPMorgan without proper internal controls for managing and overseeing JPMorgan operations.

C.       Awarding any additional appropriate equitable relief, including any injunctive or declaratory relief necessary to change and/or reform JPMorgan's corporate governance, policies and culture.

D.       Awarding restitution, disgorgement of all illicit proceeds generated as a result of the wrongful conduct alleged herein, and punitive damages;

E.       Awarding to plaintiff reasonable attorneys' fees and costs and disbursements of the action, including accountants' and experts' fees, costs, and expenses; and

F.       Granting such other and further relief as the Court deems just and proper.

---

[6] Gray and Novak did not seek reelection in April 2012 and Cote and Futter stepped down in July 2013.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 3, 2014

**MORGAN & MORGAN, P.C.**

Peter Safirstein

Domenico Minerva
28 W. 44th St., Suite 2001
New York, NY  10036
Telephone: (212) 564-1637
Facsimile: (212) 564-1807
Email: psafirstein@forthepeople.com
Email: dminerva@forthepeople.com

*Attorneys for Plaintiff*

## VERIFICATION

I, Chaile Steinberg, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I have been a shareholder of JPMorgan Chase & Co. since at least 2004, and am currently a shareholder of JPMorgan Chase & Co.

I make this Verification under penalty of perjury that the foregoing is true and correct.


_____

CHAILE STEINBERG


SWORN TO AND SUBSCRIBED,
before me this 22nd day of January, 2014.
State of Pennsylvania, County of Montgomery


_____
Notary Public


_____11/17/16_____
My Commission Expires


COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
REGINA J BROWN
Notary Public
SPRINGFIELD TWP., DELAWARE COUNTY
My Commission Expires Nov 17, 2016